[Crim. No. 12401. In Bank. Dec. 26, 1969.]

In re NORMAN ARTHUR WHITEHORN on Habeas Corpus.

**COUNSEL**

Norman Arthur Whitehorn, in pro. per., and Joseph L. Bortin, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Derald E. Granberg, Deputy Attorney General, for Respondent.

**OPINION**

**SULLIVAN, J.**—Norman Whitehorn and Charles Hummel were charged with the murder of Mrs. Angela Gums. After a joint trial, a jury found both defendants guilty of first degree murder and fixed the punishment of Whitehorn at death and the punishment of Hummel at life imprisonment. Hummel did not appeal. In *People* v. *Whitehorn* (1963) 60 Cal.2d 256 [32 Cal.Rptr. 199, 383 P.2d 783], we affirmed in its entirety the judgment of conviction as to Whitehorn. Subsequently Whitehorn's sentence was commuted by the Governor to life imprisonment without possibility of parole.

In the instant proceeding for a writ of habeas corpus we are presented with the question whether Whitehorn's conviction should be set aside under the authority of *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], on the ground that the admission at the joint trial of Hummel's extrajudicial statements inculpating Whitehorn violated the latter's right of cross-examination secured by the confrontation clause of the Sixth Amendment to the United States Constitution although the jury was instructed that such evidence was admitted only against his codefendant Hummel.

We briefly state the relevant facts. In the early hours of April 22, 1962, Whitehorn and Hummel, met Mrs. Gums in a Hollywood restaurant and offered to drive her home. Instead they drove her first to a place in the North Hollywood hills and then to a place near Santa Monica, in each of which spots Whitehorn had intercourse with her in the car, in the presence of Hummel and apparently without her consent although she did not resist to any great extent. Later, while Whitehorn held the victim with her arms pinned to her body, Hummel strangled her with a necktie.

Petitioner and Hummel were arrested after Hummel, who was a private in the United States Marine Corps, admitted to a Marine Corps investigator that petitioner and he were implicated in the death of Mrs. Gums. Hummel

made a number of statements to law enforcement officers in petitioner's absence and one statement in petitioner's presence at a joint interview. Petitioner, himself, also made free and voluntary statements to law enforcement officers. All of the above statements of both men (except those made by petitioner during a polygraph examination) were admitted in evidence during the prosecution's case in chief subject to the limiting instruction that they were to be considered only against the respective declarant-defendant making them.

On April 26, 1962, Hummel made an oral statement to a Marine Corps' investigator in the presence of a Catholic priest, in which he related the circumstances of the murder. That evening he made practically the same statement to Los Angeles County sheriff's deputies, which was tape recorded and later transcribed. These statements were substantially as follows: Hummel who had known Whitehorn previously met the latter at a USO recreation center on the evening of April 21, 1962. After this both men visited a number of bars and finally a restaurant where they met the victim and offered to drive her home. Whitehorn, however, drove by her house and into the hills, first stopping at a service station to check his tires. After threatening to hurt Mrs. Gums if she did not consent, Whitehorn had intercourse with her twice, once in the hills and once near Santa Monica. On the second occasion, according to Hummel, the victim managed to climb over into the rear seat where Hummel was sitting. Whitehorn told Hummel to grab her. Hummel put his arms around her and *Whitehorn* took a tie out of his pocket, placed it around her neck and strangled her. They then threw the victim's nude body over a fence and scattered pieces of her underclothing along a highway.

After making the last statement, Hummel led the investigating officers to the victim's underclothing and to the location of her body, as well as to the place where she had been strangled. Statements made by him during this time were confined to directing the officers to each of the locations.

Whitehorn was arrested on April 27, 1962. The officers on that day conducted a joint interview of both men which was tape recorded and transcribed. At this interview Hummel repeated, but in more detail, his earlier statements in which among other things he said that *Whitehorn* was the one who actually did the strangling. In the afternoon of that day, Hummel, in the absence of Whitehorn gave the officers still another statement furnishing additional details of Whitehorn's intercourse with, and strangling of, the victim.

Beginning on May 1, 1962, Hummel began to change portions of his previous statements. His tape-recorded statement, given to the officers on that day, related inter alia that it was he and not Whitehorn who placed the

necktie around the victim's neck and strangled her, that it was he and not Whitehorn who threw her clothing from the car, and that Mrs. Gums did not struggle or cry out when Whitehorn stripped off her clothing.

Hummel's last statement, given on August 9, and stenographically recorded, made the following additions to his May 1st statement: When the two men stopped at the service station, they alighted from the car and Whitehorn asked Hummel if he would like to go into the hills and have intercourse with Mrs. Gums, adding that if "she went out she wasn't coming back." Hummel indicated his agreement. During the ride Hummel kept motioning to Whitehorn "with my hand, taking my thumb and passing it from left to right across my throat, . . ." This meant, according to Hummel, "knocking her off, . . ." It was Hummel's not Whitehorn's tie that was used. During the acts of intercourse, Mrs. Gums was crying and struggling with petitioner.

At the trial both defendants took the stand. Hummel testified generally in accordance with his extrajudicial statements as to the events of the evening which led up to the first act of intercourse in the hills. He "had done some considerable drinking and there's several periods of time during this I don't know whether I was awake or not, but I just can't remember what happened." On direct examination he testified that when Whitehorn finally stopped the car in the hills, he, Hummel, was in the rear seat and Whitehorn and the victim were in the front seat; that he saw certain movements in the front seat during the course of which Whitehorn lowered his trousers; that at no time did he hear the victim scream or remonstrate with Whitehorn; and that finally the parties straightened up and Whitehorn started the car.

As to the second act of intercourse, Hummel testified on direct examination that after the car came to a stop, Whitehorn and the victim got into the rear seat and Hummel into the front seat; that he did not witness any act of sexual intercourse at any time; that he recalled holding a tie around Mrs. Gums' neck and that he "relieved the pressure from the necktie around Mrs. Gums' throat," although he did not recall putting the tie around her neck; and that he "just let go of the necktie. I don't know. She sort of dropped"; and that he then drove the car to another spot where both men removed the victim's body.

Under cross-examination by the prosecutor, Hummel admitted that statements made to the investigating officers on April 26 and April 27, 1962, were to the effect that the first act of intercourse was not voluntary on the victim's part; and that in such statements and others made to two doctors at the county jail he had indicated some recollection of having put the tie around the victim's neck at the second place where the car was stopped.

Whitehorn testified that both acts of intercourse were free and voluntary

on Mrs. Gums' part and that he and Mrs. Gums had torn off all her clothing "in the heat of passion." He further testified that, although he knew what was happening when Hummel had the necktie around her throat it happened too fast for him to do anything about it but he did not assist him in any way.

As we have indicated at the outset, petitioner contends that the admission into evidence of Hummel's extrajudicial statements violated his rights under the Sixth Amendment to the United States Constitution and denied him due process of law.

Since our affirmance five years ago of petitioner's conviction, the United States Supreme Court has decided the case of *Bruton* v. *United States, supra,* 391 U.S. 123. ■ As we recently explained in *In re Hill* (1969) 71 Cal.2d 997, 1008 [80 Cal.Rptr. 537, 458 P.2d 449], *"Bruton* holds that it is a denial of the right to cross-examination, guaranteed to a defendant in a criminal case by the confrontation clause of the Sixth Amendment, to admit at a joint trial an extrajudicial confession of a codefendant which implicates the defendant, despite instructions to the jury to disregard the confession as evidence against the nonconfessing defendant." The basic reason underlying this holding is the substantial risk that the jury despite the instruction to the contrary, will consider such statement in determining the defendant's guilt. In *Roberts* v. *Russell* (1968) 392 U.S. 293 [20 L.Ed.2d 1100, 88 S.Ct. 1921], the high court held that the above rule announced in *Bruton* was to be applied both to state and federal prosecutions, with full retroactivity without regard to time, since the error involved goes to the fairness of the guilt-determining process. (See *In re Hill, supra.*)

We think it is manifest that the admission of Hummel's extrajudicial statements in the instant case falls within the above rules announced in *Bruton* and *Roberts.* The Attorney General, however, contends that there was no error under *Bruton* since, Hummel having testified and having been available for cross-examination at the joint trial, Whitehorn's constitutional right under the Sixth Amendment was respected, and alternatively that if there was error, it was harmless. We proceed to consider this bifurcated contention.

First, however, we decline, as we must, the Attorney General's invitation to resolve the question before us on the basis of our holdings in *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], and *People* v. *Charles* (1967) 66 Cal.2d 330 [57 Cal.Rptr. 745, 425 P.2d

545]. In *Aranda,* we adopted new rules governing the introduction of extrajudicial statements of a codefendant at a joint trial; taking pains to point out that "In the absence, however, of a holding by the United States Supreme Court that the due process clause requires such change, the rules we now adopt are to be regarded, not as constitutionally compelled, but as judicially declared rules of practice to implement section 1098." (63 Cal.2d at p. 530; fn. omitted.) In *Charles,* which was also decided before *Bruton,* we said that the "purposes of *Aranda* thus do not require its application to convictions long since final" (66 Cal.2d at p. 333) and while we held "that cases still pending on direct review should be adjudicated in accord with the principles which *Aranda* established" (66 Cal.2d at p. 334), we declined to accord to *Aranda* full retroactive operation without regard to time. While we intimate no intention to qualify our *Aranda* rules, we point out that the principles of *Bruton,* while dealing with the same area, have been cast in a constitutional mold. In applying them, we are under the compulsion of *Roberts* to give them full retroactive effect.

We turn to the Attorney General's contention that there is no *Bruton* error in the first place because Hummel took the stand. He asserts that *Bruton* in language set forth in the footnote[1] "strongly implies" that the confrontation requirement is satisfied in such a situation. He also directs our attention to *Santoro* v. *United States* (9th Cir. 1968) 402 F.2d 920, and *Rios-Ramirez* v. *United States* (9th Cir. 1968) 403 F.2d 1016, which distinguished *Bruton* and held it inapplicable where the confessing defendant testified and was available for cross-examination. While it is arguable that some implication, as urged by the People, can be found in *Bruton,* we do not apprehend therein anything either explicitly stating or convincingly indicating that *Bruton* should have no application where the confessing

---

[1]The *Bruton* court declared: "Plainly, the introduction of Evans' confession added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since Evans did not take the stand." (391 U.S. at pp. 127-128 [20 L.Ed.2d at pp. 480-481].) "The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed." (391 U.S. at p. 136 [20 L.Ed.2d at p. 485]; fn. omitted.) The court also adverted to its action in 1966 in amending rule 14 of the Federal Rules of Criminal Procedure as evidencing its repudiation of the basic premise in *Delli Paoli* v. *United States* (1956) 352 U.S. 232 [1 L.Ed.2d 278, 77 S.Ct. 294], that the encroachment on the right to confrontation consequent upon the admission of the confessing defendant's extrajudicial statement could be avoided by an instruction to the jury, quoting the following explanation from the Advisory Committee on the rules: " 'A defendant may be prejudiced by the admission in evidence against a co-defendant of a statement or confession made by that co-defendant. This prejudice cannot be dispelled by cross-examination if the co-defendant does not take the stand. Limiting instructions to the jury may not in fact erase the prejudice . . . ' " (391 U.S. at p. 132 [20 L.Ed.2d at p. 482].)

defendant testifies at the joint trial. Furthermore, we considered[2] the above two federal cases in *In re Hill, supra,* 71 Cal.2d 997, 1009 and observed: "We do not believe that such is a proper interpretation of *Bruton* in the light of recent right-to-confrontation cases decided by the Supreme Court and by this court.[3]     ▮     Rather, we think that the admission at a joint trial of an extrajudicial confession of a codefendant which seriously implicates the defendant deprives the latter of his right to confrontation even if the confessing codefendant takes the stand and gives testimony in accordance with his prior confession. However, the testimony so given by the confessing party has a significantly mitigating effect as to any prejudice which might be claimed to result from the admission of the extrajudicial confession."

▮ As we said in *Hill,* "the Sixth Amendment right to confrontation is intended to give to defendants in criminal cases the right to cross-examine as to statements made by the witness *at the time the witness makes those statements, before the same trier of fact which sits on the issue of his guilt* providing that there is no showing of a legal necessity to justify the admission of such statements without cross-examination." (71 Cal.2d at p. 1012.)[4]

---

[2]While we recognize that the decisions in *Santoro* and *Rios* are persuasive and entitled to great weight, we are of course not bound by the decisions of lower federal courts even on federal questions. (*Stock* v. *Plunkett* (1919) 181 Cal. 193, 194-195 [183 P. 657]; *People* v. *Estrada* (1965) 234 Cal.App.2d 136, 145 [44 Cal. Rptr. 165, 11 A.L.R.3d 1307].)

[3]We cited: *Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]; *Barber* v. *Page* (1968) 390 U.S. 719 [20 L.Ed.2d 255, 88 S.Ct. 1318]; *People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal. Rptr. 599, 441 P.2d 111] (cert. den. (1969) 393 U.S. 1051 [21 L.Ed.2d 693, 89 S.Ct. 679]); *People* v. *Green* (1969) 70 Cal.2d 654 [75 Cal. Rptr. 782, 451 P.2d 422].

[4]As we explained in *Hill,* such conclusion harmonizes with our recent holdings in *People* v. *Johnson, supra,* 68 Cal.2d 646, and *People* v. *Green, supra,* 70 Cal.2d 654, which while not involving the joint trial problems of *Bruton* or *Aranda,* dealt with the cognate subject of adequate cross-examination. In *Johnson* and again in *Green,* deeming ourselves under the compulsion of recent cases articulating the Sixth Amendment right of confrontation (e.g., *Pointer* v. *Texas, supra,* 380 U.S. 400, and *Barber* v. *Page, supra,* 390 U.S. 719), we held that cross-examination at trial relating to a statement given previously is constitutionally inadequate. We further made clear in this case why we did not feel impelled to a contrary conclusion by the holding in *Harrington|v. California* (1969) 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726] and observed: "Until such time as the Supreme Court affirmatively indicates that cross-examination of the confessing codefendant at trial is adequate under the confrontation clause, we feel compelled to hold that the admission of his confession is constitutional error of the type condemned by *Bruton.*" (*In re Hill, supra,* 71 Cal.2d at p. 1013.)

■ Applying *Bruton* v. *United States, supra,* 391 U.S. 123 and *Roberts* v. *Russell, supra,* 392 U.S. 293, as we did in *Hill,* we conclude that the admission of Hummel's extrajudicial statements inculpating Whitehorn was error despite the fact that the jury was instructed to disregard such hearsay evidence in determining Whitehorn's guilt and despite the fact that Hummel testified at their joint trial. We must now determine whether the People have proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]; see *In re Hill, supra,* 71 Cal.2d 997, 1014.)

We note at the outset that the prosecution's case was presented, argued and submitted to the jury as one of first degree murder based upon two theories: first, that the murder was a "willful, deliberate and premeditated killing" (Pen. Code, § 189); and second, that it was first degree felony murder, since it was "committed in the perpetration of . . . [a] rape, . . ." (Pen. Code, § 189.) Whitehorn's defense was essentially a denial that the murder was deliberate or premeditated and, as to the second theory, a denial that it was first degree felony murder because, as he claimed, the acts of intercourse were consented to by Mrs. Gums and therefore could not constitute rape. On this vital issue of consent, Whitehorn testified at trial that the acts of intercourse were free and voluntary on the victim's part, and not resisted by her. This in-court testimony was contrary in significant respects to his extrajudicial statements received in evidence, wherein he stated to the officers that the first act of intercourse was *not* voluntary on the victim's part, that, although not resisting, she was not happy about it, that she asked him *not* to do it, and that she was very possibly in fear. At trial, Whitehorn explained this inconsistency by stating that she merely objected to the act taking place in Hummel's presence. The defense also introduced on this issue of consent evidence as to particular previous conduct of the victim and as to her general reputation to the end of establishing that she was an unchaste woman and one likely to have given her consent on the night in question. To the same end, Whitehorn testified that she had been stripped of her clothing not by a violent unwanted attack upon her but in the course of a frenzy of passion in which she was a willing participant. In short, one must conclude from all of this that Whitehorn had raised this issue of consent and thus of the rape itself.

Since we cannot ascertain from the record, upon which of the prosecution's theories the jury based its verdict finding petitioner guilty of murder of the first degree, in order to uphold the verdict despite the *Bruton* error resulting from the admission of Hummel's extrajudicial statements, we "must be able to declare a belief that it was harmless beyond a reasonable

doubt" (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710]) as to *both* of such theories. (*People* v. *Anderson* (1965) 63 Cal.2d 351, 360 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Robinson* (1964) 61 Cal.2d 373, 405-406 [38 Cal.Rptr. 890, 392 P.2d 790]; *People* v. *Orcalles* (1948) 32 Cal.2d 562, 573 [197 P.2d 26]; see *Huebotter* v. *Follett* (1946) 27 Cal.2d 765, 770-771 [167 P.2d 193].)

We therefore proceed to assess the impact of the *Bruton* error on each of the prosecution's theories of case. Following *Bruton* we accept the premise that the extrajudicial statements of Hummel must be deemed to have been considered by the jury against petitioner despite the court's limiting instruction to the contrary.

Although Hummel's several extrajudicial statements differed in some of their details and were even conflicting in some parts where he subsequently made corrections or changes, nevertheless all of the statements were consistent in asserting that the victim did not voluntarily engage in the acts of intercourse. In the statement made to the officers on April 26, 1962, Hummel declared that at the time of the first act of intercourse, Whitehorn told the victim "Don't fight me or I'll hurt you" and that Mrs. Gums in turn had pleaded with him to desist; had started crying and eventually had become angry, saying "you're going to regret this the rest of your life." He also stated at the same time that at the time of the second act of intercourse the victim "started screaming and hollering, and everything else. She wasn't exactly screaming and hollering but she was raising quite a fuss, . . ." On April 27, Hummel repeated his statement of the preceding day in Whitehorn's presence when both men were jointly interviewed by the officers. On the same day, Hummel gave a separate statement which was stenographically recorded and was substantially the same as his prior statements but in more detail. These were followed by a statement on May 1, wherein Hummel, changing his earlier account of the victim's death, said that it was he who had strangled Mrs. Gums with the necktie while Whitehorn held her and answered in the negative a question as to whether the victim was "struggling or screaming or crying" at the time of the second act of intercourse. Finally, in his statement of August 9, Hummel said that on such occasion the victim *was* struggling and crying but was not screaming.

In this last statement, Hummel also recounted a conversation between Whitehorn and himself at a service station on the way to the first stop in the hills. This took place outside the car and the victim's presence. In substance, Whitehorn asked Hummel "if I would like to go out with this woman for the purpose of having intercourse" and added that "if she goes out she's not coming back." Later on, en route to the location where the second act of intercourse took place, Hummel "kept motioning to Norman with my hand, taking my thumb and passing it from left to right across my throat, . . ."

In summary, Hummel's statements essentially boil down to this: Whitehorn and he took the victim to two isolated spots in each of which Whitehorn had sexual intercourse with her over her protests and against her will. Finally, Whitehorn held the victim while Hummel strangled her.[5] There had been some understanding between the two of them that the victim was to be killed.

As we have stated earlier, Whitehorn also made free and voluntary statements to law enforcement officers, which were admitted in evidence during the prosecution's case in chief. In the morning of April 27th, Whitehorn directed officers to the beach where the victim's clothes had been buried. En route to the beach and while he was there, Whitehorn, in a conversation with a Marine investigator, related a story similar to Hummel's as to how the two men met and as to their activities up to the time of the first act of intercourse. Whitehorn admitted that he had engaged in intercourse with the victim on two separate occasions and that after the second time at Hummel's direction he grabbed and held the victim while Hummel took a necktie off the front seat and strangled her. Whitehorn then explained how the two men disposed of the body and of the victim's clothing and personal effects. When asked if the woman "fought him off" Whitehorn replied "what could she do with two men in the car."

In the afternoon of April 27th, Whitehorn made a statement which was stenographically recorded. He stated that he was the first to have sexual intercourse with the victim implying that Hummel also had intercourse with her. In response to the question "Was this act of sexual intercourse free and voluntary on her part?" Whitehorn declared "I wouldn't say so, no." He was then asked: "In other words, she wasn't happy about the situation?" to which defendant answered "No." When asked if she resisted, he replied, "Not to any great extent." In this statement Whitehorn also said that while they were driving and Mrs. Gums was sitting in the back seat, Hummel made a gesture doubling up his fist and pointing his thumb downward, indicating to Whitehorn that apparently Hummel wanted to do away with her, although Hummel did not say so. Whitehorn also stated that when they stopped the second time, he tore off all of the victim's clothes, that although she "made several statements" she did not physically resist; that he believed she asked him not to do it; and that she was very possibly in fear. Upon completion of the act and while he held her arms pinned to her sides,

---

[5]Despite the change in Hummel's account as to who applied the necktie, the undisputed facts show that both men participated in the strangling. As we said upon our affirmance of petitioner's conviction "there is no substantial likelihood in the light of the record as a whole that [the jury] would have believed [Whitehorn] was the one who put the tie around Mrs. Gums' neck and choked her. The testimony of Hummel, as well as that of appellant, was to the effect that it was Hummel who choked her." (People v. Whitehorn, supra, 60 Cal.2d 256, 262.)

Hummel strangled her. In summary then, Whitehorn's statements were to the effect that he drove Mrs. Gums and Hummel to two different locations; that without Mrs. Gums' consent he had intercourse with her at each location; and that while he was holding her after the second act of intercourse, Hummel strangled her.

The testimony of both defendants at the trial differed substantially from their respective extrajudicial statements. As we have pointed out, Hummel testified that the victim did not remonstrate or protest when Whitehorn first had intercourse with her and that when the car was stopped the second time, he did not witness any act of intercourse and did not hear the victim object to being in the car or request to be let out of it. On cross-examination, Hummel denied that he had had any conversation with petitioner about killing Mrs. Gums after having intercourse with her, explained that by doubling up his fist and pointing "thumbs down" he meant that he wanted Whitehorn to turn down the radio, and that he did not know exactly what was said between petitioner and the victim at the time of the first act of intercourse.

Whitehorn, as we have already said, testified that both acts of intercourse were voluntary on the victim's part, that her objections were not to the intercourse itself but to its taking place in Hummel's presence, and that he and the victim had stripped off her clothing during moments of passion.

However, for the purposes of our present inquiry as to whether the admission of Hummel's statements was prejudicial to petitioner, the significance of the evidentiary setting we have depicted lies not in the fact that each defendant attempted to change his extrajudicial statements but in the fact that the extrajudicial statements of each were essentially the same. Out of court, both defendants gave the same account of the evening's events; their initial statements to the officers (although Hummel's were in more detail) made clear that Mrs. Gums had been subjected to two acts of intercourse despite her protests and over her resistance. To put it another way, she did not consent to either act and had been raped twice and murdered in the perpetration of both rapes or at least of the second one. It is manifest then that in respect to the prosecution's theory of first degree felony murder-rape, the jury heard the same evidence from petitioner's extrajudicial statements as they heard from Hummel's; that is, that the victim did not freely and voluntarily engage in the acts of intercourse. We cannot see how petitioner could have been prejudiced by the error relating to Hummel's statements, when he had made essentially the same statements himself.

Nor do we find the *Bruton* error prejudicial when we consider it in respect to the prosecution's theory that the killing was willful, deliberate and premeditated. Although petitioner's extrajudicial statements did not

coincide with Hummel's as to the conversation at the service station prior to the first act of intercourse at which time, according to Hummel, petitioner indicated Mrs. Gums might not "come back," nevertheless both men made statements to the effect that en route to the second spot, Hummel kept motioning with his hand, taking his thumb and passing it across his throat. Petitioner admitted that this sign indicated to him "that apparently he [Hummel] would want to dispose of her, . . ." He further stated that he held the victim with her arms pinned while in his plain sight Hummel strangled her. When we consider this episode in the light of the full narrative of the statements of both men, we cannot see how the admission of Hummel's statements prejudiced petitioner in respect to this theory.

In short we can find no prejudice to petitioner in the fact that the jury might have considered Hummel's statements against him, because in general petitioner made essentially the same statements himself. Additionally we may speculate that he had the benefit of more favorable testimony from Hummel at trial. But, quite apart from this, petitioner had the opportunity to cross-examine Hummel at trial, to exploit the latter's change of story and to challenge his out-of-court narrative of events. Pertinent here are our observations in *In re Hill, supra,* 71 Cal.2d 997, where the confessions of defendants Hill and Saunders were admitted in evidence under instructions of the court that they were to be considered only against the confessing defendant and not as evidence against any other defendant.[6] Hill's confession implicated Saunders and Saunders' confession implicated Hill; neither defendant took the stand at trial. Holding that any resulting *Bruton* error was not prejudicial, we reasoned: "However, most persuasive to us of the harmless nature of the error was that each confessed to the crime and each confession was properly admitted in evidence against the confessing party. As we have said in another context: '[T]he confession operates as a kind of evidentiary bombshell which shatters the defense.' (*People* v. *Schader* (1965) 62 Cal.2d 716, 731 [44 Cal.Rptr. 193, 401 P.2d 665].) A 'confession . . . constitute[s] persuasive evidence of guilt, . . .' (*People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]) and necessarily has a strong impact on the jury. Since there was no evidence whatsoever in favor of Hill's innocence and only Saunders' initial exculpatory statement as evidence of his innocence the confession of each was evidence which was 'merely cumulative' (*People* v. *Jacobson* (1965) 63 Cal.2d 319, 331 [46 Cal.Rptr. 515, 405 P.2d 555]) of evidence properly admitted against the other. 'Where the jury has heard not only a codefendant's confession but defendant's own confession no such

---

[6]It is not necessary for our present purposes to discuss the confession of a third defendant which was admitted in *Hill*.

"devastating" risk attends the lack of confrontation as was thought to be involved in *Bruton.*' (*United States* ex rel. *Catanzaro* v. *Mancusi* (2d Cir. 1968) 404 F.2d 296, 300; . . .)" *(In re Hill, supra,* 71 Cal.2d 997, 1014-1015.)

In the instant case petitioner's own extrajudicial statements established not only that he raped Mrs. Gums on each occasion but also that after the second rape petitioner with full knowledge of what was going on participated in her strangulation. Under the circumstances we are satisfied that the error in admitting Hummel's statements was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710].)

The order to show cause is discharged and the petition for writ of habeas corpus is denied.

Traynor, C. J., Peters, J., Tobriner, J., and Molinari, J. pro tem.,\* concurred.

**BURKE, J.**—I concur in the order discharging the order to show cause and in the denial of the petition for writ of habeas corpus.

McComb, J., concurred.

Petitioner's application for a rehearing was denied January 21, 1970.

---

\*Assigned by the Chairman of the Judicial Council.