[Crim. No. 14221. In Bank. Mar. 22, 1971.]

In re FRED BANKS on Habeas Corpus.

*R didt use this one. ... was ...*

## COUNSEL

Fred Banks, in pro. per., and Thomas J. Klitgaard, under appointment by the Supreme Court, for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Edward P. O'Brien, Deputy Attorney General, for Respondent.

## OPINION

**PETERS, J.**—Petitioner, Fred Banks, has been in prison since his 1962 conviction on two counts of robbery and one count of attempted robbery in the second degree. (Pen. Code, § 211.) His case appears before us after

a long and tortuous history, including three appearances before the United States Supreme Court.[1]

### Petitioner's Counsel On Appeal

In this habeas corpus proceeding, petitioner contends that he was effectively denied, despite his vigorous protests, the assistance of counsel on appeal. We agree.

After conducting his own defense at trial, petitioner was convicted on August 9, 1962. He requested the appointment of counsel to represent him, and counsel was appointed by the Court of Appeal on November 13, 1962. Counsel obtained several extensions of time. The last extension expired March 21, 1963. On August 13, 1963, the clerk of the Court of Appeal was constrained to admonish counsel that he had not yet filed a brief in the case. On October 25, 1963, the clerk phoned counsel to request speedy filing of the brief.

On February 24, 1964, a year and a quarter after he was appointed, counsel finally filed a 23-page brief. The brief mentions only two cases. One point raised demonstrated complete ignorance of when the information was filed and when the trial commenced. The strongest ground for claiming error in the trial record, given the state of the law in early 1964, related to denial of counsel at trial. Yet *Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733], is nowhere mentioned in counsel's brief. Although making a number of additional claims of error, counsel nowhere marshalled the evidence to show that such claimed errors would be prejudicial in view of the record as a whole. The most obvious conclusion to be drawn from reading the brief is that

---

[1]Judgment was entered on August 9, 1962. Petitioner filed a timely appeal. The Court of Appeal affirmed. This court denied a petition for hearing. The United States Supreme Court vacated the opinion and remanded for consideration by the Court of Appeal in light of *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. (*Banks* v. *California* (1966) 382 U.S. 420 [15 L.Ed.2d 499, 86 S.Ct. 622].)

The Court of Appeal again affirmed, relying on the then-correct standard of *People* v. *Watson,* 46 Cal.2d 818, 835 [299 P.2d 243]. The United States Supreme Court once again vacated the opinion and remanded for consideration in light of *Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*Banks v. California* (1967) 387 U.S. 92 [18 L.Ed.2d 588, 87 S.Ct. 1505].)

The Court of Appeal again affirmed. Petitioner failed to petition this court for a hearing, directly petitioning the United States Supreme Court for certiorari. That court granted the writ, heard oral argument (partially reported, 5 Crim.L. Rptr. pp. 4035-4038), but then dismissed certiorari on the grounds that petitioner had not asked this court to review the judgment. (*Banks* v. *California* (1969) 395 U.S. 708 [23 L.Ed.2d 653, 89 S.Ct. 1901].)

counsel gave it no thought whatsoever, but instead retyped suggestions submitted to him by petitioner, a layman.[2]

Petitioner sought further relief in propria persona. His efforts were rewarded. (*Banks* v. *California, supra,* 382 U.S. 420.) On remand for consideration in light of *Griffin* v. *California, supra,* 380 U.S. 609, petitioner requested the appointment of different counsel. The Court of Appeal denied petitioner's request. It informed counsel that he might brief and argue the case on remand. Counsel did not submit brief, motion, or any explanation for his failure to do so. Nor did he appear to argue the case or give reason why he felt argument unnecessary. So far as appears, counsel did not communicate with the court in any way whatsoever. The court refused petitioner's request to argue the case before the court himself. The Attorney General submitted a four-paragraph letter in which he claimed there existed "an overwhelming factual basis in favor of conviction."

The Court of Appeal, without benefit of brief or argument by defense counsel, proceeded to decide the case, affirming the conviction on the basis of "abundant evidence of appellant's guilt."

Petitioner again sought further relief pro se, again prevailed. The Court of Appeal was once again asked to consider its opinion, this time in light of *Chapman* v. *California, supra,* 386 U.S. 18, 23-24. (*Banks* v. *California, supra,* 387 U.S. 92.) The Attorney General stated that he did not believe further argument was necessary, and rested upon his prior arguments to the court. The Attorney General, having previously submitted argument on the issue of prejudice, could afford this position; defense counsel, who had failed to challenge the original argument, again failed to communicate in any way with the court or with petitioner. The Court of Appeal once again denied petitioner's request for appointment of different counsel, and once again refused to allow him to argue pro se before the Court of Appeal.

---

[2]This conclusion is reinforced by counsel's subsequent letter to petitioner. The letter reads in part as follows: "If it is any consolation, the only result that could have been obtained other than this would be to obtain a new trial at which . . . in my opinion the evidence would have been sufficient to obtain another conviction. [¶] In my opinion there is no further justification to continue with any further appeal. . . . [T]he large number of points which were raised in your behalf in this appeal were raised primarily because you had requested them to be included. They were not, in my opinion, error in the legal sense. [¶] So far as the record indicates, you appear to have received a fair and impartial trial. [¶] . . . [¶] I therefore take this occasion to end my efforts in this matter and close my file." Counsel did not send a copy of this letter to the Court of Appeal. Nor did he comply with the simple "no-merit" letter procedure then used by appointed counsel to withdraw from a case.

It should be added that the numerous errors of grammar, orthography, and typography, with which this brief is replete, also suggest that he merely had petitioner's suggestions retyped.

In a brief opinion, the Court of Appeal adopted its former judgments in full and declared its belief, "based upon the conclusive evidence of his guilt, that such error was harmless beyond a reasonable doubt."

*Douglas* v. *California* (1963) 372 U.S. 353, 356-357 [9 L.Ed.2d 811, 814-815, 83 S.Ct. 814], holds that denial of counsel to an indigent accused on his first (and only) appeal as of right is an invidious discrimination violative of the Fourteenth Amendment. *Anders* v. *California* (1967) 386 U.S. 738, 744 [18 L.Ed.2d 493, 498, 87 S.Ct. 1396], gave expanded meaning to the right to counsel by holding that the "constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client, as opposed to that of *amicus curiae.*" We thereafter specified the duties of appointed counsel, adopting specific rules regarding the performance of counsel and procedures for withdrawing from a case in which counsel concludes he cannot in good faith represent his client. (*People* v. *Feggans,* 67 Cal.2d 444, 447-448 [62 Cal.Rptr. 419, 432 P.2d 21].) Finally, in the recent case of *In re Smith,* 3 Cal.3d 192 [90 Cal.Rptr. 1, 474 P.2d 969], we held that appointed appellate counsel must not only perform as an advocate, but must perform competently as well.

■ Although defendant's right to a court-appointed counsel does not include the right to require the court to appoint more than one counsel, he is entitled to relief where the record clearly shows that the first appointed counsel is not adequately representing him. (*People* v. *Marsden,* 2 Cal.3d 118, 123 [84 Cal.Rptr. 156, 465 P.2d 44], quoting *People* v. *Mitchell,* 185 Cal.App.2d 507, 512 [8 Cal.Rptr. 319].) The lawyer appointed for petitioner had taken 15 months to file his first brief. Counsel had twice failed to argue—either in oral or written form—when invited to do so by the Court of Appeal, even though his client had won a significant reprieve. Counsel violated the quintessence of *Anders* and *Feggans* when he had expressly stated his belief to petitioner that the case had no merit, refused to act as an advocate for petitioner in the Court of Appeal, yet did not write the then-proper (*In re Nash,* 61 Cal.2d 491, 495 [39 Cal. Rptr. 205, 393 P.2d 405]) "no-merit" letter to the court announcing his withdrawal from the case.

Surely the slightest dilatoriness on the part of counsel upon the second remand should have been enough cause for the court to question whether counsel still represented petitioner, and if so, whether his performance was such as to give petitioner good cause to have new counsel appointed.

■ In any event, counsel's failure to argue at any time the specific issues raised by the United States Supreme Court on the two remands

shows that petitioner did not have effective assistance of counsel.[3] Here, as in *In re Smith, supra,* 3 Cal.3d 192, 198, "petitioner would have fared better had his attorney withdrawn in favor of a pro se brief from petitioner, . . ." In effect, petitioner was not represented by counsel and was thus clearly denied his right to assistance of counsel.[4]

Because petitioner was effectively denied the assistance of counsel in crucial stages of his statutory appeal, we must grant petitioner's writ of habeas corpus. (*Douglas* v. *California, supra,* 372 U.S. 353; *Anders* v. *California, supra,* 386 U.S. 738; *In re Smith, supra,* 3 Cal.3d 192.)

Penal Code section 1484, requires that in habeas corpus proceedings we "dispose of such party as the justice of the case may require, . . ." Where the case comes before us solely on the issue of denial of counsel on appeal (particularly in a pro. per. petition), we ordinarily re-instate the appeal and remand to the Court of Appeal to reconsider its decision with the aid of effective advocacy by appellate counsel. (E.g., *In re Smith, supra,* 3 Cal.3d 192, 203, 204.) However, competent counsel for both petitioner and respondent have now fully briefed and argued the merits of the appeal before this court, and, in view of the history of the case, conservation of scarce judicial resources warrants our passing upon the merits of the appeal in accordance with the provisions of section 1484 of the Penal Code.

*The Appeal*  On the night of May 4, 1962, between 11 and 11:30 p.m., one attempted robbery and two robberies of liquor stores took place in the same Oakland neighborhood. The description and modus operandi of the robber given by all witnesses strongly indicate that the attempted rob-

---

[3]On oral argument (see *infra,* fn. 4) the Chief Justice of the Supreme Court of the United States queried "Mr. O'Brien, do you think that when this Court sends a case back for reconsideration in the light of a particular case the court can say 'we have reconsidered and we are still of our original opinion'? . . . Do you not think it calls for some review of the situation through counsel . . . ?" (5 Crim.L.Rptr. p. 4037.)

[4]Although it is in no way binding upon us, the reaction of the Justices of the United States Supreme Court to counsel's effectiveness is noteworthy. In oral argument held before that court decided to dismiss certiorari (*Banks* v. *California, supra,* 395 U.S. 708), Chief Justice Warren, puzzled that petitioner had not first appealed to this court for a hearing, asked Deputy Attorney General O'Brien whether petitioner had had counsel. Mr. Justice Marshall asked whether there was anything in the record from the lawyer and whether he had argued. Mr. O'Brien said no, but that "it was a professional judgment on counsel's part not to file a supplemental brief and argue on the Chapman issue." Later Mr. Justice Fortas commented "You would assume counsel would at least file a paper and say 'I am still counsel and I have nothing further to say'. . . ." Upon questioning by Mr. Justice Marshall, Mr. O'Brien admitted that petitioner's request to argue pro se was denied, but justified this denial on the fact that petitioner had counsel. Mr. Justice Marshall declared "[T]his man did not have counsel anyway, anyhow, any time." (5 Crim.L. Rptr. pp. 4036-4037.)

bery and the robberies were committed by the same person. The robber was described as having on a sportcoat, hat, and yellowish shirt. In all three instances the robber walked into the store, went directly to the person at the cash register and, without preliminary conversation, demanded money. In all three instances the robber had his right hand in his jacket pocket pointed so as to simulate a gun.

At 11 the robber entered Vince's Liquor Store. He walked to the rear cash register where Jow, an employee, was working. He pointed the hand in his pocket and asked for all the money. Wong, a co-owner of the store, heard the demand. He took a .38 pistol from under the counter, reached over, and struck the robber's hand. Ascertaining that the robber did not have a gun, Wong told him to put his hands up. The robber refused, cursed Wong, and fled from the store.

Jow and Wong discussed the identifying characteristics of the robber while waiting for the police to arrive. Jow had had a better view of the robber because the robber was directly in front of him. Wong had taken just a "quick look" at the robber. When the police arrived the two men gave a composite description of the robber as "[s]tout, about 50 years old, dark complexion, sport jacket, and a shirt kind of yellow." Neither mentioned a mustache nor beard. Both were uncertain at trial whether they had described the robber as having a scar. (The police report on the robbery did not mention a scar as an identifying characteristic.)

Approximately 11:15 p.m. a robber entered the Three Point Liquors Store. He immediately approached the clerk, Perry, and demanded money. His right hand was in his jacket pocket and pointed what Perry thought might be a gun. At first Perry thought the robber was kidding and began to wait on Griffith, another customer. When the robber repeated his demand, Perry understood he was serious, and Griffith ran out of the store. As Griffith ran out he saw Jones, who was about to enter, and said the store was being held up. Jones misunderstood, thought he heard that "they was closing up," and rushed into the store, bumping into the robber, who was by this time backing away with what Perry estimated to be $100.

When the police arrived, Perry described the robber as a Negro wearing a sportcoat and having a scar on the left side of his face by the lip. Griffith, who was present during Perry's description, described the robber as having on a sportcoat, hat, and yellowish shirt, and a scar on the left side of his face. Neither man reported that the robber had a mustache nor beard. Jones gave no description at all.

Approximately 11:30 p.m. a robber entered Linden Liquors, proceeded directly to the cash register where part-owner Pauletich was stand-

ing, and gestured to the cash register with his gun. Pauletich's mother asked what the robber wanted. Pauletich told her, and she handed over what Pauletich estimated to be $175 to $200 and later reported as $165. Pauletich said that the money was given in denominations of $20, $10, $5, and $1, including 30 to 40 $1 bills.

When the police arrived, Pauletich described the robber as a Negro wearing a sportcoat and hat, with a scratch or scar on his face. He did not report that the robber had a mustache or beard.

A few minutes after the last of these robberies occurred, petitioner entered Sobek's Liquors Store. He talked to Smith, the clerk behind the counter, for about five minutes, about a number of matters, including a woman employee killed in the store a short time before. Petitioner asked Smith if he had a gun. "Why?" asked the clerk. Petitioner responded, "Well, I might want to hold you up." Some policemen walked in at that time. Petitioner asked for a half pint of Old Taylor. The clerk complained to the policemen about petitioner's remark.

One policeman told the clerk there had been some robberies. Turning to petitioner, he said, "Buddy, you fit the description," and began to search petitioner. Petitioner was silent during the few moments it took the officer to extract money from his pockets.[5] Petitioner then protested (according to Smith), "I worked for it."

There is no evidence regarding the amount of money found in petitioner's pockets alone. The total extracted from his pockets and wallet was $176. This amount included no $20 bills, seven $10 bills, 15 $5 bills, and 31 $1 bills. When the officer asked petitioner where he got the money, petitioner again said that he had earned the money and further stated that he had cashed a check that day. Petitioner also told the officer that if he would call Pittsburg, California, petitioner's home, he could verify the statement as to the money. (This the officer did not do.) Petitioner also denied having robbed anybody.

Immediately after petitioner was taken into custody (about a half hour after the robbery at Linden Liquors), he was taken to Linden Liquors. Petitioner was escorted into the store, held on each side by a policeman. Petitioner is black; the two policemen and Pauletich (a part-owner) are

---

[5]When the prosecution had developed this point at trial, the court itself emphasized petitioner's initial silence: "THE COURT: . . . When he told the defendant that 'Some robberies had been committed and you fit the description,' what did the defendant say, if anything? [¶] THE WITNESS: Nothing, he didn't say anything. [¶] THE COURT: What did he do? [¶] THE WITNESS: Well, he wanted to search him, and he just raised his— [¶] THE COURT: No, what did the defendant do? [¶] THE WITNESS: He did nothing. [¶] THE COURT: Nothing, all right."

white. In a procedure which took "just a matter of a moment or so," Pauletich identified petitioner as the robber. Petitioner at all times wore his hat and sportcoat, apparel similar to that attributed to the robber.

The day after the robberies and the arrest, Perry, Wong, Jow, Griffith, and Jones were asked to attend a lineup. Pauletich, who had identified petitioner the night before, was not asked to come.

The five witnesses were placed in a viewing room together and told not to talk to each other. It was testified at trial, however, that "we was all talking together."

Petitioner was lined up with four other Negroes. According to Wong, one other man besides petitioner appeared to be fiftyish. According to Griffith, all the other men were "young guys."

The clearest identifying characteristic of the robber, according to all witnesses, was his apparel: a sportcoat, hat, dark trousers, and yellowish shirt.[6] Petitioner had been arrested in similar clothing. At the lineup petitioner wore the clothing in which he had been arrested.[7] The two men to petitioner's left were both dressed in windbreaker jackets, light-colored trousers and light-colored shirts.[8] To petitioner's right were two young men in dark trousers. One had on a polka-dot sport shirt, the other a light shirt and suit vest. No other suspects had the prime identifying characteristics given by the witnesses at the scene of the robberies, the sportcoat and hat.

Four of the five witnesses present relied heavily on the resemblance of petitioner's apparel to that of the robber. Jones, who had had but a "slight look" at the robber for "just a short period of time," identified petitioner as the robber only after he put on the hat. Griffith, who had had a longer look at the robber ("about five minutes") was similarly able to identify petitioner as the robber only after he put on the hat. Griffith also noted that all the rest of the viewees were "young guys" and that none of them had hats or sportcoats on. Jow was even less sure of petitioner's identity. He was also unable to identify petitioner until he put his hat on, and even then was unsure. At trial Jow claimed that the glare of the glass had prevented him from getting a good look at the lineup. Wong, who had not had as long or as good a view of the robber as Jow had had, was more

---

[6]None of the witnesses identified petitioner as the robber on the basis of a detailed memory of the robber's face. Some witnesses reported that the robber had a scar, as did petitioner, but they placed it at varying places on the robber's face.

[7]There can be no objection to having petitioner appear in the clothing in which he was arrested. (*People* v. *Floyd*, 1 Cal.3d 694, 712 [83 Cal.Rptr. 608, 464 P.2d 64].)

[8]This description is based upon the police photo of the lineup, admitted into evidence as defendant's exhibit B.

certain of his identification, but also said that he was "more positive" after petitioner put on the hat.[9]

Perry, who had previously boasted that he would recognize the robber even if he saw him a hundred years later, was the first witness to view the lineup. He pointed to petitioner, standing in the middle position, as the robber. When the police asked if anyone could positively identify the man, Perry volunteered. He walked up to petitioner and, in his presence, said that petitioner was the man who had robbed him. Petitioner made no reply.[10] It is not clear whether the other four witnesses heard these remarks or saw whom Perry had chosen, but at least Griffith and Jow were aware that another witness had gone out and identified "the suspect."

At the subsequent preliminary examination, the district attorney did not call Jow, Jones, or Griffith as witnesses, perhaps because they furnished the least positive identification testimony. Two and a half months after this set of events, and just prior to the scheduled date of trial, these three witnesses were each called to the district attorney's office, where each was shown a single photo of petitioner. Although these witnesses had been uncertain of petitioner's identity as the robber the morning after the robbery, they became steadfast in their identification at trial.

At the time of the offenses, petitioner had a mustache and a beard. He did not testify in his own behalf. Four of his former employers in Pittsburg did testify. Mrs. Cunningham, part owner of the Fashionette Beauty Shop, testified that petitioner had installed a hot water heater in her shop, for which she had paid him $3.00. Mr. Pollard, owner of a garage, testified that he had paid petitioner $40 three days before the robbery took place for working part time in the garage. When Mrs. Nance, owner of the Bay Hotel, asked Pollard if he knew of a plumber, Pollard sent petitioner to work for her. Mrs. Nance testified that petitioner had done plumbing

---

[9]Official police notes of the lineup confirm the inconclusiveness of these identifications. The notes describe Jow as "not too sure," Griffith as "not too positive," and Jones as sure only after he saw petitioner with his hat on.

[10]Although the testimony on this point was clear, the court again emphasized petitioner's silence: "Q. [by the prosecution] And at the time you said that, did the Defendant say anything? A. No. [¶] THE COURT: Would you answer audibly? [¶] THE WITNESS: No. [¶] THE COURT: Now, how far away from the Defendant were you when you said, 'This is your man,' in the lineup? [¶] THE WITNESS: I walked right up close to him, right up face to face to him. [¶] THE COURT: Would you say you were two or three feet away from him? [¶] THE WITNESS: Yes. [¶] THE COURT: Did you point to him or anything? [¶] THE WITNESS: Yes, I did. [¶] THE COURT: You pointed directly at him? [¶] THE WITNESS: At him, yes. [¶] THE COURT: And then made the statement, 'This is the man'? [¶] THE WITNESS: Yes. [¶] THE COURT: All right. And the Defendant did not answer you in any way? [¶] THE WITNESS: No. [¶] THE COURT: Was he looking at you? [¶] THE WITNESS: Yes. [¶] THE COURT: All right, go ahead, Mr. Murphy."

work for her, including the installation of a sink, that he had submitted a bill for his work, and that she had paid him $140 four days before the robbery took place. Finally, Mrs. O'Hara testified that petitioner came to her home on the day before the robbery and unstopped her commode, bath, and head. She paid him $12.50 for his work. In all, it was testified by four persons having a business relationship with petitioner that he had been paid $195.50 just a few days before the robberies. All payments were in cash. In addition Mr. Pollard, for whom petitioner had worked as a part time helper, testified that he had had occasion to see petitioner carrying around as much as $200 in his possession.

The prosecutor commented on petitioner's silence in the face of accusations at the liquor store and lineup, and upon petitioner's failure to testify at trial. In his opening argument the prosecutor commented briefly on petitioner's silence in the liquor store. He then concluded his opening argument to the jury with an emphatic reference to petitioner's failure to testify, declaring that "you can take that failure to testify as indicating that the Defendant would be unable to deny it."[11]

In its closing argument the prosecution commented extensively on petitioner's silence in the face of accusatory statements and upon his failure to testify, emphasizing that "the jury can consider that failure [to testify] as tending to indicate the truth of such evidence, and as indicating that among the various inferences that you could draw from the evidence, those inferences unfavorable to the defendant are the most probable."[12]

Finally, in regard to considerable testimony that defendant had earned the money found in his possession, the prosecutor stated, "there isn't a particle of evidence in this case that the same money that the defendant earned was the same money that he had in his possession. [¶] . . . [W]e

[11]The conclusion of the People's opening argument was as follows: "Now, another factor which I think you can consider in a case of this kind is the failure of the person charged to take the witness stand and testify in his own behalf. [¶] I think you will be instructed on that by the Court, and I think the instruction is to the effect that if a person does not see fit, which he, of course, does not have to do, to take the witness stand to deny evidence that has been presented against him, that you, as the jury, may consider that that evidence may—you can take that failure to testify as indicating that the Defendant would be unable to deny it. [¶] Well, at any rate, the instruction will be given to you on the person's failure to take the witness stand, and you will, I am sure, understand it and be able to apply that to this particular case. [¶] Well, ladies and gentlemen, that is the evidence in this case, I submit that the evidence proves beyond any reasonable doubt that the Defendant in this case is guilty of the three offenses with which he is charged. [¶] Thank you."

[12]The prosecutor told the jury that the inference to be drawn from silence in the face of accusations was that, "because he didn't deny it, that is a form of admission of guilt." The prosecutor then recapitulated the incidents in which these silences occurred.

don't know exactly what the defendant's circumstances are because he hasn't testified before you."[13]

In his instructions to the jury the judge reinforced the effect of the prosecutor's remarks by in part repeating them. He instructed the jury that it should consider petitioner's silence in the face of accusatory statements "as indicating an admission that the accusation thus made was true." He then stated, "As to any evidence of facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify . . . the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable."

The instant trial took place before the United States Supreme Court's decision in *Griffin* v. *California, supra,* 380 U.S. 609. The comments by judge and prosecutor on petitioner's failure to testify were proper under the law of the time, but of course constitute a clear violation of the requirements of *Griffin.* Respondent so concedes, and in considering the merits of the appeal we must apply *Griffin* in view of the remands of the United States Supreme Court.

██ Such error requires reversal unless its effect is harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18.) ██ The burden is on "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id.,* at p. 24 [17 L.Ed.2d at p. 710]; see also *In re Whitehorn,* 1 Cal.3d 504, 512 [82 Cal.Rptr. 609, 462 P.2d 361]; *In re Hill,* 71 Cal.2d 997, 1004 [80 Cal.Rptr. 537, 458 P.2d 449].)

The People assert in this court the following matters in support of their contentions that the prosecution's comments were harmless beyond a reasonable doubt: (1) that petitioner was apprehended by the police in the act of preparing to rob Sobek's; (2) that petitioner had $176 on his person when apprehended; (3) that at one store the robber was given 30 to 40 $1 bills, and petitioner had 31 $1 bills when apprehended; and (4) that six eyewitnesses positively identified petitioner as the robber.

The matters relied upon by respondent, however, when viewed in the light of the entire record do not establish that the *Griffin* errors were harmless beyond a reasonable doubt. First, there was certainly no evidence that petitioner was preparing or intended to rob Sobek's. Indeed, his be-

---

[13]The prosecution attempted to infer that the defendant might have used the money paid him to pay bills.

havior in Sobek's was entirely different from that said to be part of the robber's modus operandi. Whereas the robber immediately proceeded to the cash register in each store and asked for money, petitioner spent five minutes talking about various matters to the clerk behind the counter. The robber entered the stores with his right hand in his jacket pocket and immediately began waving it to indicate that he had a gun. Petitioner exhibited no such behavior.

Second, reputable business people established that petitioner had only a few days previously been paid $195.50 for plumbing work. One of these witnesses also testified that he had had occasion to see petitioner carrying amounts of $150 to $200 on his person. The $176 recovered from petitioner was taken not merely from his pockets, but also from his wallet. Moreover, the amount stolen just a few minutes before was testified to be $265 to $290, far more than found in petitioner's possession.

Third, the denominations petitioner possessed, while including a number of $1 bills, included no $20 bills, although there was positive testimony that the robber had been given such denominations.

Finally, the six "positive" identifications referred to by the People were not quite what the People would have them be. Indeed, the prosecutor felt the need to argue that even though "the other identification may not be very good," the jury could infer that the robber was the same person in all three cases from his similar modus operandi.

Of the six witnesses who identified petitioner as the robber at trial, five had previously identified him at a lineup the day following the robberies. Assuming for present purposes the propriety of the lineup, there was nevertheless evidence from which a juror could infer that the identification testimony of each witness was not independent of that of the other witnesses and that several witnesses were uncertain of their choice.

All these witnesses were put in one room, at one end of which there was a glass window which looked in upon a lineup room. Although the witnesses were told not to talk to each other, it was testified at trial that "we was all talking together." The effect of one witness' physically confronting a viewee on the willingness of other witnesses to identify a suspect also cannot be ignored.

There was also evidence from which a juror could infer that the lineup was so suggestive that it should be given little weight. Thus one witness testified that only the petitioner had on a hat or sportcoat and that all the rest of the persons in the lineup were "young guys." One of the witnesses admitted that he had not been at all sure of the robber's identity at the lineup because of the glare of the glass window. Another did not become

"positive" until petitioner put on his hat. And three others had been unable to identify petitioner until he put on his hat. Petitioner brought out at trial that these three witnesses were shown photographs of petitioner (alone) just before trial. Certainly the jurors might assume that the reliability of the identification testimony of these three witnesses was dubious, given the prosecutor's need to refresh their memories just prior to trial.

Not one of the eyewitnesses to the crime reported that the robber had a mustache and beard, both of which petitioner possessed. The fact that these witnesses nevertheless identified petitioner as the robber at the lineup strongly indicates that they relied for identification not on any personal characteristics of the robber, but upon what they remembered of the clothing he wore. The fact that petitioner was the only person in the lineup wearing clothes resembling those of the robber might put a jury on notice that the eyewitness identifications on which the prosecution based its case were not very reliable.

■ In view of the evidence indicating that petitioner's money was innocently acquired, that there was a discrepancy in the amounts and denominations of the money although he was arrested so shortly after the robberies, that his behavior differed from that attributed to the robber, and that the validity of the identifications was undermined, we cannot conclude that the prosecution's case was so compelling that an average juror would not have been materially influenced by the repeated admonitions regarding the inferences to be drawn from petitioner's failure to testify.[14] (*People* v. *Haston,* 69 Cal.2d 233, 256-257 [70 Cal.Rptr. 419, 444 P.2d 91]; *People* v. *Coffey,* 67 Cal.2d 204, 220 [60 Cal.Rptr. 457, 430 P.2d 15]; cf. *People* v. *Modesto,* 66 Cal.2d 695, 712 [59 Cal.Rptr. 124, 427 P.2d 788].) The *Griffin* error was therefore not harmless beyond a reasonable doubt.

Closely related to the *Griffin* error in this case is the use of petitioner's silence in the face of accusations as adoptive admissions of guilt.

■ ■ In *People* v. *Cockrell,* 63 Cal.2d 659, 669-670 [47 Cal.Rptr. 788, 408 P.2d 116], certiorari denied (1967) 389 U.S. 1006 [19 L.Ed. 2d 604, 88 S.Ct. 568], we held that "[t]he rationale of *Griffin* implicitly proscribes drawing an inference adverse to the defendant from his failure to reply to an accusatory statement . . . ." even if he did not at the time expressly claim his privilege against self-incrimination. (See also *Miranda*

---

[14]A possible reason for petitioner's failure to take the stand is that he had been convicted in 1936 of three felonies.

v. *Arizona* (1966) 384 U.S. 436, 468, fn. 37 [16 L.Ed.2d 694, 720, 86 S.Ct. 1602, 10 A.L.R.3d 974].)

The People concede that *Cockrell* prohibits the use of petitioner's silence at the lineup as an adoptive admission.

In contrast, the People assert that petitioner's silence in the liquor store, when accused and searched by the policeman, can properly be interpreted as an adoptive admission, contending that *Cockrell* should be limited to situations which we have in another context called the "accusatory stage" of police investigations (*People* v. *Morse,* 70 Cal.2d 711, 722 [76 Cal. Rptr. 391, 452 P.2d 607]). Even if *Cockrell* were so limited, upon which we indicate no opinion in this proceeding, it would apply here. The accusatory stage is certainly reached "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 444 [16 L.Ed.2d 694, 706].) Petitioner may not have been formally arrested at the moment the police began to search him, but had been significantly deprived of his freedom of action. (*People* v. *Fioritto,* 68 Cal.2d 714, 718 [68 Cal.Rptr. 817, 441 P.2d 625].)

It should be noted that the *Cockrell* errors could only compound the prejudicial effect of the *Griffin* errors in this case, especially since petitioner's silence in the face of accusations was held to be an admission that he was "the man."

The writ is granted with directions that petitioner be remanded to the Superior Court of Alameda County for proceedings consistent with this opinion.

Wright, C. J., Tobriner, J., and Burke, J., concurred.

**SULLIVAN, J.,** Concurring.—However remiss appellate counsel may have been in proceedings antedating the United States Supreme Court's 1967 remand for consideration in light of *Chapman,* in my view petitioner suffered no prejudice as a result thereof because his efforts in propria persona were sufficient to secure to him all the relief to which he was entitled. However, I agree with the majority that in the particular circumstances of this case petitioner was denied the effective assistance of appellate counsel by counsel's failure, after the remand for consideration in light of *Chapman,* to offer any argument to the Court of Appeal regarding the application of the newly announced rule of harmless error. Counsel's neglect in this regard is especially striking in light of the fact that at no time in the prior appel-

late proceedings had he made any argument to the Court of Appeal urging that the *Griffin* error was prejudicial.

In all other respects I concur in the opinion of the majority.

**McCOMB, J.**—I dissent. I would deny the writ.