285 So.2d 418 (1973)
William G. HORTON, Appellant.
v.
STATE of Florida, Appellee.
No. 71-861.
District Court of Appeal of Florida, Second District.
August 31, 1973.
On Rehearing November 2, 1973.
Raymond E. LaPorte, Tampa, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee, and Charles Corces, Jr., Asst. Atty. Gen., Tampa, for appellee.
McNULTY, Judge.
Appellant William G. Horton and his brother Leslie were indicted for rape, found guilty after a joint jury trial and mercy was recommended as to William. William appeals directly to this court and raises three points, only one of which is meritorious and requires reversal.
Upon being arrested appellant and his brother were taken to the county jail. They were advised of their constitutional *419 rights pursuant to Miranda v. Arizona[1] and Leslie expressly waived them. William, however, indicated he wanted an attorney; so further interrogation of William ceased at that point. The brothers were then separated and Leslie proceeded to give a statement incriminating both himself and William. Thereafter the detectives brought Leslie back into the room with William and asked Leslie to repeat before William what he had theretofore told them in William's absence. This was done, in the words of one of the officers, so as to "... make this statement by Leslie Horton admissible in court." It's apparent from the record that the officers believed that Leslie's statement in the presence of William would make it admissible against William if William stood silent in the face thereof; admissible, that is, under the old "tacit admission" rule. This assumption was, of course, erroneous;[2] but in any case, at that point in time William did not remain silent and after Leslie repeated his admissions in his presence finally said, "That's right. That's what happened", thus, in effect, adopting Leslie's statement.
We interpose to say here that we condemn the tactics used by the officers in separating the two suspects after one had requested counsel and then, after the other had confessed, requiring the latter to confront the first in the manner done here. Apart from the fact that the "tacit admission" rule is no longer valid,[3] we think such a ploy is the equivalent of impermissible "custodial interrogation" as proscribed by Miranda in the event it elicits a response.
To get on with the facts though, a short time after the aforementioned "interrogation" when the brothers were being booked, William told the officers that he had a change of heart and that he would more fully talk to them. Whereupon, he repeated in detail basically the same story told by Leslie with some minor changes.
Later on that same day an assistant state attorney came to the county jail to investigate the matter and, without knowing of William's prior request for an attorney, he too warned each of the suspects of his rights. This time William signed a waiver card and again recounted the details of the offense charged.
On these facts, the trial judge granted a pre-trial motion to suppress William's statements as being taken in violation of Miranda, supra. At the joint trial, however, wherein neither defendant testified, the court, over the objection of William, allowed Leslie's statement in evidence which, as noted, incriminated William.
So the battle lines are drawn. Appellant contends that the trial court was correct under Miranda, supra, in suppressing his admissions. But he insists the trial court was in error under the Bruton rule[4] in thereafter admitting Leslie's admissions against him, over his objection, at a joint trial wherein Leslie did not testify, thereby resulting in the denial of his rights of confrontation and cross-examination. The state, on the other hand, argues that the trial court should not have suppressed Wiliam's statement to begin with because clearly he intelligently, understandingly, and voluntarily waived his Miranda rights. Thus, it is said, since the suppressed admissions of William were in essence identical to those of Leslie, Leslie's admissions into evidence amounted to no more than allowing William's statement into evidence, which should have been done in the first place. Accordingly, says the state, no prejudicial error was committed under *420 Bruton in allowing Leslie's statement to be used against William.
However rhetorical the state's argument it is no less sophistic since its major premise must fall. That is to say, it cannot be articulated as a matter of law that the trial judge had to find an intelligent, understanding and voluntary waiver on the part of William. As to this, the state's contention must factually rest: (1) on the apparent adoption by William of Leslie's statement when the latter first repeated it in William's presence; (2) on the fact that thereafter, at the booking desk, William apparently reconsidered and waived his rights to an attorney; and (3) on the waiver card he thereafter signed after having been further fully advised of his rights by the assistant state attorney. Concededly, on these facts the trial judge could have found a valid waiver; and had he done so notwithstanding the existence of the facts and circumstances relating to the aforementioned initial wrongful tactics of the officers, we have no hesitancy in saying we would have been constrained to affirm. But was he bound to so find? We think not.
Stated otherwise, we are more precisely faced with whether, as a matter of law, the trial judge sitting as the trier of fact in a pre-trial proceeding on a motion to suppress, could not have found as he in effect did find here that any waivers by William were not intelligently, understandingly and voluntarily made, or, in the alternative, that they were fatally "poisoned" by the initial wrongful acts of the officers and not sufficiently thereafter purged therefrom so as to render them independently admissible.[5] We cannot so hold. The trial judge heard all the testimony and observed all the witnesses. His conclusions on the critical points find ample support in the record and are therefore beyond our scrutiny.
However, although having acted well within his province in suppressing William's statements under Miranda, supra, we think the trial judge erred thereafter in allowing Leslie's statement into evidence as against William at the joint trial. At that point the discipline of Miranda was out of the picture and the matter became a pure Bruton situation.[6]Bruton, supra, therefore clearly controls here and requires a reversal of the judgment and sentence appealed from. Accordingly, the cause is remanded for a new trial as to appellant William G. Horton.
Reversed.
MANN, C.J., concurs.
LILES, J., dissents.

ON REHEARING
McNULTY, Judge.
On rehearing the State suggests that we overlooked the full import of Harrington v. California[1] which held that notwithstanding a violation of the mandate of Bruton v. United States[2] such violation does not constitute reversible error in all such cases. The point is well taken.
In Harrington, supra, the United States Supreme Court stated:[3]
"We held in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.2d 1065, that `before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond *421 a reasonable doubt.' Id., at 24, 87 S.Ct. 824, at 828, 17 L.Ed.2d at 710. We said that, although `there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error' (id., at 23, 87 S.Ct. 824, at 827, 17 L.Ed.2d at 710), not all `trial errors which violate the Constitution automatically call for reversal.'"
And in Harrington, of course, a violation of the Bruton rule was the constitutional question presented. The Court went on to say:[4]
"... [T]he case against Harrington was so overwhelming that we conclude that this violation of Bruton was harmless beyond a reasonable doubt, unless we adopt the minority view in Chapman (386 U.S. at 42-45, 87 S.Ct. 824, at 836-838, 17 L.Ed.2d, at 720-723) that a departure from constitutional procedures should result in an automatic reversal, regardless of the weight of the evidence."
This latter proposition was rejected. The Court went on:
"... Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the [co-defendant's confession] on the minds of an average jury. ... By that test we cannot impute reversible weight to the [assailed confession].
"We do not depart from Chapman; nor do we dilute it by inference. We reaffirm it. We do not suggest that, if evidence bearing on all the ingredients of the crime is tendered, the use of cumulative evidence, though tainted is harmless error. Our decision is based on the evidence in this record. The case against Harrington was not woven from circumstantial evidence. It is so overwhelming that unless we say that no violation of Burton can constitute harmless error, we must leave this state conviction undisturbed." (Italics supplied.)
Accordingly, the Court affirmed the conviction.
Likewise here. Indeed, we view the evidence in this case to be even more conclusively persuasive than that in Harrington, and we have no doubt whatsoever that Leslie Horton's confession, as it may have tended to incriminate appellant, had but minimal impact on the jury. Entirely apart from Leslie's confession the record clearly shows the following:
During the early morning hours of February 22, 1971, two intruders entered an apartment near the University of South Florida, which was occupied by the three co-eds who had rented it and their two overnight guests, one male and one female. The intruders were men, one of whom was tall, thin and dark-haired. He wore a dark blue stocking mask over his face, a black hood (apparently detached from a parka-type jacket) over his head and wore black tennis shoes. The second intruder was short, blonde, and wore glasses. He, however, had a pair of beige pantyhose over his face and wore a zippered, parka-type jacket made of dark blue sweatshirt material with an attached hood over his head. Each carried a pistol, one a small dark short barreled revolver and the other a larger, long-barreled, two-toned black and silver revolver.
All five occupants of the apartment had been sleeping but were awakened by the intruders at gun point. They were then ultimately herded into one of the rooms and were tied and bound in one way or another. The two intruders then proceeded to ransack the apartment during the course of which the shorter intruder drew a pocket knife from his pocket, opened it, and threatened the male occupant who had sought to extricate himself from the drama. Order was again restored to the satisfaction of the two intruders but two of the girls were then taken separately, each by one of the intruders, to another room where *422 one was raped and an attempt to rape was made on the other. That rape is the one involved in the instant case.
During the subsequent investigation that night, the foregoing facts were promptly and clearly related to investigating officers by all five victims; and detailed descriptions were given of the two intruders and of the afore-listed weapons and articles of clothing, including the face masks. Approximately one month later, patrol units of the Hillsborough County Sheriff's Department were patrolling the area of the University of South Florida because of the instant offenses and because of others that had occurred nearby. The officers were very familiar with the reports and descriptions given by the victims in each such case, and with respect particularly to the break-in and rape with which we are here concerned had familiarized themselves with an artist's composite sketches of the described culprits. On this occasion, their attention was drawn to a motor vehicle which was being operated in violation of a traffic ordinance. The officers thereupon pursued the vehicle and stopped it for the initial purpose of investigating the traffic violation. Upon approaching the stopped car, one of the officers observed that the occupants matched the descriptions and composite sketches of two of the suspects he had been studying about during his investigation of the various assaults in the area. When he arrived at the passenger door of the car he looked inside and noticed lying on the floorboard of the car a small, dark short barreled revolver. In the center of the front seat was a pair of beige pantyhose. Also on the floorboard, partially under the driver's seat, he observed another pistol. This one a larger, two-toned black and silver revolver. On the back seat he noticed a hooded, zippered parka-type jacket made of dark blue sweatshirt material, a black hood which appeared to have been detached from a jacket of the same type, and a pair of black tennis shoes. The officer expressly recalled identical items as having been described in the reports he had studied, particularly the report relating to the rape in the instant case and described above. Moreover, the driver, who proved to be Leslie Horton, clearly matched the description of the short, blonde, glasseswearing intruder in the instant case; and his passenger, who proved to be the appellant William Horton, matched the description of the tall, thin, dark-haired second intruder. Each was placed under arrest; and a search made incident thereto yielded a pocket knife from Leslie's pocket and a part of a dark blue stocking from William's pocket.
At trial the small, short-barreled revolver was positively identified by four of the five occupants of the apartment entered on February 22 as aforesaid, and all five of them identified the larger, two-toned black and silver revolver. The dark blue hooded parka, the detached black hood, the beige partyhose and the dark blue stocking mask were all identified by four of the five victims. Additionally, two of them positively identified the pocket knife, and one witness said that the black tennis shoes were the same type worn by the taller intruder. Clear and positive in-court identification of Leslie Horton was made by three of these witnesses, two of whom also positively identified William. Notwithstanding that each intruder wore a mask this identification was possible, it appears, since on one or two instances the masks were moved or removed from each of their faces at one time or another during the episode.
In addition to the testimony of the foregoing five victims in the instant case, the State established that a very similar offense, including a rape, occurred some three weeks previously in the same area. This evidence of a prior similar offense was properly admitted under the Williams rule[5] because one of the two girls involved in that offense testified herein and in addition to positively identifying both defendants as *423 having committed it, also identified the dark blue, hooded, zippered parka, the black tennis shoes (worn by William, she said) and the beige pantyhose. But even more significantly, she identified the beige pantyhose as being hers, stating that they had been stolen from her during such prior offense by Leslie Horton who she positively identified as the intruder who raped her on that occasion. This evidence was clearly relevant to the identity of the defendants in the instant case and thus satisfied the mandate of Williams as aforesaid.
From all the foregoing positive facts and circumstances, which the record establishes with uncommon clarity, we reiterate that we do not entertain any reasonable doubt about the harmlessness of Leslie's confession. Moreover, to the extent it may have incriminated William, it was not only cumulative (concededly an insufficient ground of itself upon which to predicate harmlessness) but it was indeed mere fourth degree corroboration. That is to say, every material fact it purported to admit was otherwise overwhelmingly corroborated threefold.
Accordingly, rehearing is granted. We affirm, however, the previous holdings and conclusions in our original opinion filed herein, except we recede from the mandate thereof which assumed prejudicial error. In view whereof, the judgment and sentence appealed from should be, and they are hereby, affirmed.
MANN, C.J., concurs.
LILES, J. (Ret.), concurs specially.
LILES, Judge (Ret.), (concurring specially).
I concur that the petition for rehearing should be granted and I concur only that the judgment and sentence appealed from should be affirmed.
NOTES
[1] (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
[2] See, e.g., State v. Galasso (Fla. 1968), 217 So.2d 326; Jones v. State (Fla.App. 1967), 200 So.2d 574.
[3] Id.
[4] Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.
[5] See, Wong Sun v. United States (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.
[6] See, n. 4, supra.
[1] (1969) 395 U.S. 250, 89 S.Ct. 1726, 23 L.E.2d 284.
[2] (1968) 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.
[3] See, n. 1 at p. 251, 89 S.Ct., at p. 1727.
[4] See, n. 1 at p. 254, 89 S.Ct. at p. 1728.
[5] Williams v. State (Fla. 1959), 110 So.2d 654.