353 So.2d 911 (1977)
Willie L. COOK, Jr., Appellant,
v.
STATE of Florida, Appellee.
James Clinton Pettis, Appellant,
v.
State of Florida, Appellee.
Timothy Black, Appellant,
v.
State of Florida, Appellee.
Tweelyn Ray Brown, Appellant,
v.
State of Florida, Appellee.
Nos. 75-706, 75-668, 75-704 and 75-705.
District Court of Appeal of Florida, Second District.
December 28, 1977.
Morris W. Milton, of Williams & Milton, St. Petersburg, for appellant Cook.
*912 Jack O. Johnson, Public Defender, Bartow, and Stephen O. Rushing, Asst. Public Defender, Tampa, for appellants Pettis, Black and Brown.
Robert L. Shevin, Atty. Gen., Tallahassee, and Richard G. Pippinger, Asst. Atty. Gen., Tampa, for appellee.
SCHEB, Judge.
Appellants Pettis, Black, Brown, and Cook were indicted for conspiracy to commit sexual battery and sexual battery. After a joint trial a jury found all appellants guilty on both counts. The trial court sentenced each to fifteen years imprisonment on the conspiracy charge. Pettis, Black, and Cook were each sentenced to thirty years on the sexual battery conviction, to run concurrently with their conspiracy sentences. Brown was sentenced to ninety-nine years for his conviction of sexual battery, to run consecutively to his conspiracy sentence. After their motions for new trial were denied, these appeals ensued and have been consolidated for argument before this court.
We focus on appellants' contention that they were denied their sixth amendment right to confront their accusers when incriminating statements of three of the codefendants were introduced at their joint trial where no appellant testified. We hold that if such an error did occur it was harmless beyond a reasonable doubt, because there was overwhelming evidence of each appellant's guilt.
As previously mentioned, appellants did not testify or present any evidence at their trial. The state called the victim, a 23 year-old white female, who testified that on the night of December 3, 1974, she had gone driving with her estranged husband so that they might talk over their marital problems. After riding around for several hours, she and her husband had sexual intercourse in the car. At the victim's request, her husband dropped her off at a Lakeland shopping center some distance from her home at approximately 10:30 p.m.
As she was walking home through downtown about midnight, a car with five black males stopped and offered her a ride. She refused and asked them to leave her alone. They continued to follow her, so she ran and attempted to hide from them. This proved unsuccessful, as one of the men exited the car and captured her. She was then forced into the car where she was abused and threatened by her captors, who drove her to a secluded, wooded area. There she was sexually assaulted by four of the five men. Later she was released in the area of her home after being warned that her life would be in danger should she divulge the incident. As soon as she arrived home she told her family what happened. Her stepfather notified the Polk County Sheriff's Department. Appellants were subsequently apprehended.
After their arrests, appellants Brown, Black, and Pettis each gave incriminating statements to the police. Before trial defense counsel for each appellant moved for severance because they apprehended the prejudicial effect of these statements against their clients.[1] Rather than allow the cases to be severed, the state chose to delete any reference to the other appellants from each of the codefendants' statements. See Fla.R.Crim.P. 3.152(b)(2).
In edited form the statements were introduced at trial over defense counsel's objection. In Black's statement he claimed the victim had accepted a ride, and thereafter consented to the acts of sexual intercourse. Brown, on the other hand, claimed in his statement that he had parted company with the others prior to the episode. Pettis admitted by his statement that he had been with the others and that he had sexual intercourse with the victim; however, he claimed he had nothing to do with abducting her initially, and had not caused her any injury. Later in the statement, Pettis acknowledged that the victim had been sexually assaulted and was in fear of her life on the night of the episode.
Before being read to the jury, each of these conflicting statements was edited extensively *913 through a cooperative effort of the trial judge, the state attorney, and reluctantly by defense counsel in an effort to delete any direct references to the codefendants. As each statement was introduced, the trial judge cautioned the jury that the particular statement was to be received in evidence only against the appellant who had given the statement.
While all direct references to the other appellants were excised, the statement by Pettis made references to "you and these four subjects," the "four of us," "they," "the group," "them," etc. Black, Brown, and Cook contend that even though the trial court in good faith attempted to eliminate all references to them from the Pettis statement, this attempt was unsuccessful. Black and Cook argue that Pettis' statement refuted their defense of consent. Brown argues that his defense of not being present when the offense occurred was also refuted by the Pettis statement. Finally, Pettis claims the trial court edited his statement too extensively, i.e., by removing all prejudicial references to the remaining codefendants the jury was not in a position to evaluate the full context of his statement. This, Pettis says, resulted from the necessity to transcribe his tape-recorded statement which thereby eliminated his voice demeanor.
While it is true that the Pettis statement was read from a copy transcribed from his original tape recording, omitting references to others, no contention is made that his admissions were misrepresented. Nor do Black's statement to the effect that the victim consented to acts of sexual intercourse and Brown's statement that he left the group prior to the alleged offense prejudice Pettis, as these statements do not conflict with Pettis statement; therefore, appellant Pettis has no valid complaint against the admission of his own statement.
The challenges by appellants Black, Brown, and Cook pose more serious problems. In Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the United States Supreme Court held that a defendant's right to confront his accusers is violated when a codefendant's confession, which incriminates the defendant, is admitted and the codefendant chooses not to testify. Bruton further held that a jury instruction to the effect that the codefendant's confession must be disregarded in determining the defendant's guilt or innocence is ineffective and cannot overcome the prejudicial effect of the incriminating statement on the jury.
Florida R.Crim.P. 3.152 was promulgated to cope with the Bruton problem. The rule gives the state three options when the trial court determines that a defendant's statement is not admissible against a codefendant. The entire procedure is set out in subsection (b)(2) of the rule:
(b) Severance of defendants.

* * * * * *
(2) If a defendant moves for a severance of defendants on the ground that an oral or written statement of a co-defendant makes reference to him but is not admissible against him, the court shall determine whether the State will offer evidence of the statement at the trial. If the State intends to offer the statement in evidence, the court shall order the State to submit its evidence of such statement for consideration by the court and counsel for defendants and if the court determines that such statement is not admissible against the moving defendant, it shall require the State to elect one of the following courses:
(i) a joint trial at which evidence of the statement will not be admitted;
(ii) a joint trial at which evidence of the statement will be admitted after all references to the moving defendant have been deleted, provided the court determines that admission of such evidence with deletions will not prejudice the moving defendant; or
(iii) severance of the moving defendant.
As previously mentioned, the state here proceeded under (ii). When this method is utilized, questions sometimes arise as to whether the expurgation was sufficient to *914 remove the prejudicial taint condemned in Bruton.
Under the circumstances similar to those in this case, the Supreme Court of Arizona found a Bruton violation and reversed a defendant's conviction of rape. State v. Williams, 27 Ariz. App. 279, 554 P.2d 646 (1976). There the defendant had made a statement to the police that the victim had willingly had intercourse with him and nine other men. The codefendant also made a statement to the effect that the victim had consented to having intercourse with him, but was forced by the others. Both statements were introduced at their joint trial. The court, in reversing, said: "So long as the jury is highly likely to infer that the defendant is a nameless individual incriminated by the statement, the defendant's rights are nevertheless violated." 554 P.2d at 654 (citations omitted).[2]
Several federal circuits, however, have not found a Bruton violation under analogous circumstances. In United States v. Wingate, 520 F.2d 309 (2d Cir.1975), cert. denied, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976), the defendant and codefendant were convicted of conspiracy to distribute heroin. The defendant appealed, arguing that even though the codefendant's statement did not mention him directly, it was obvious from other testimony that the "man" referred to in the statement was him. The court said: "[A] defendant's statement is admissible at a joint trial, with cautionary instructions, even though other evidence in the case indicates that an unmentioned co-defendant was also involved in the activities described in the statement." 520 F.2d at 314 (citations omitted). See also United States ex rel. Nelson v. Follette, 430 F.2d 1055 (2d Cir.1970), cert. denied, 401 U.S. 917, 91 S.Ct. 899, 27 L.Ed.2d 818 (1971), and United States v. Blassick, 422 F.2d 652 (7th Cir.1970), where similar reasoning was utilized.
We see some inconsistency in the reasoning used by the various courts in analyzing Bruton problems. The Supreme Court of Arizona found a Bruton violation even though the defendant was incriminated only by his codefendant's statement when viewed in conjunction with the other testimony at their trial. On the other hand, the Second Circuit opined that the codefendant's statement must incriminate the defendant directly, and that it is not a Bruton violation where the codefendant's statement incriminates the defendant only when considered in light of the testimony of other witnesses. We feel the proper standard is the one espoused in Williams; i.e., if the jury was "highly likely" to determine from a codefendant's statement that the defendant was the nameless individual incriminated by the statement, a Bruton violation has occurred, even if the inference drawn from the codefendant's statement is incriminating only when considered in light of other evidence offered at trial.[3] Assuming, therefore, that a Bruton violation did occur in this case, we do not find it necessary to reverse the convictions because of the overwhelming evidence against each appellant.
A year after the Supreme Court decided Bruton, the Court in Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), was faced with a situation where confessions by codefendants had inculpated the appellant. Appellant, a white man, was on trial with three black men, and the black codefendants' incriminating statements mentioning a "white guy" were introduced at trial. The court assumed this to be a *915 Bruton violation. Even so, the conviction was affirmed because the error was harmless. Justice Douglas, speaking for the majority, held that the harmless error doctrine could apply to a Bruton situation if the admission of the inculpatory statement was harmless beyond a reasonable doubt. In order to determine if the error was harmless, Justice Douglas said, "Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury." 395 U.S. at 254, 89 S.Ct. at 1728.
In Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the Supreme Court once more applied the harmless error doctrine to a Bruton violation. Schneble and his codefendant were jointly tried and convicted of murder in Florida. Our supreme Court upheld Schneble's conviction, and the United States Supreme Court granted certiorari. The majority, speaking through Justice Rehnquist, was of the opinion that a Bruton violation had probably occurred when the codefendant's confession had been admitted. The court concluded, however, the error was harmless beyond a reasonable doubt in view of the overwhelming evidence of guilt as manifested by the defendant's own confession, which completely comported with the objective evidence, and the comparatively insignificant effect of the codefendant's admission. A strong dissent by Justice Marshall argued that the evidence of guilt was far from overwhelming in that Schneble's confession, upon which the majority depended, was given under circumstances that cast doubt upon its voluntariness.
This court has also applied the harmless error doctrine to uphold a conviction in a case where there had been a Bruton violation. In Horton v. State, 285 So.2d 418 (Fla. 2d DCA 1973), on rehearing the court re-examined its earlier reversal of a defendant's rape conviction, and in light of the harmless error doctrine of Harrington affirmed the conviction. See also Singleton v. State, 303 So.2d 420 (Fla. 2d DCA 1974); Thompson v. State, 300 So.2d 301 (Fla. 2d DCA 1974). We have, however, only recently reversed a criminal conviction because of a Bruton violation. Russell v. State, 349 So.2d 1224 (Fla. 2d DCA 1977).
Since we believe the harmless error doctrine is applicable here, it is, we feel, incumbent upon us to explicate the evidentiary basis of appellants' convictions. As we have noted, the victim stated that on the night of the incident she was walking through downtown Lakeland when the black Eldorado Cadillac in which the four appellants and a fifth black male were riding first approached her. She said that they offered her a ride but she asked to be left alone. The car pulled away promptly but soon came upon her again. When she noticed this, she removed her shoes and ran, but was unable to elude the car. She claimed that as the vehicle drew near, appellant Brown exited and ran her down. While being dragged into the vehicle she dropped one of her shoes which was later recovered from the area. She testified that after being forced into the car she attempted to open the door as the vehicle slowed to round the corner, but the driver sped up and frustrated her attempts to escape. She further stated that Brown slapped and choked her, forced her to drink some wine, and at one point picked up a closed pocket knife and asked the others in the car if it would be necessary for him to cut her tongue out. Brown then ripped open her jacket and blouse, tearing off some buttons, whereupon the men began to grope over her body. When the car arrived at a secluded rural area the victim was ordered out. As she exited the vehicle she took the keys from the ignition and threw them away while the men were not looking.
The victim testified that four of the five men forced her to submit to sexual intercourse.[4] While Pettis was having relations with her, she managed to extract his wallet *916 from his trousers and to hide it in the grass. At one point she was able to get up and run, but she fell into a ditch and was recaptured by one of the men.
The victim also testified that when the men discovered that she had thrown the car keys away, they became quite perturbed. Brown threatened to "bust open" her head with their wine bottle. It was then decided that Brown and Cook would go for assistance while the others would stay there with her. While Brown and Cook were away Pettis and Black had intercourse with her a second time. Sometime during these events the victim hid her underpants under the car seat of the Eldorado. Appellants Brown and Cook later returned in a Chevrolet Nova, accompanied by a truck with a towing device.
The victim testified that the four appellants drove her to the vicinity of her home in the Nova. They released her there at approximately 4:00 a.m., after warning her that they would come back and get her should she tell anyone what had happened. On arriving home she reported the incident to her parents who took her directly to the emergency room at Lakeland General Hospital where a physician confirmed her bruises, abrasions, and the presence of spermatozoa in her vaginal secretions. Her stepfather then contacted the Polk County Sheriff's office.
Later that morning the victim took her stepfather and two law enforcement officers to the scene of the incident. There the officers recovered Pettis' wallet and the wine bottle apparently used to threaten the victim. While the scene was being inspected a Nova, like the one the victim claimed she had been taken home in, came by. The officers chased the vehicle, but it got away.
The victim's stepfather also testified. He said that on the night of the incident his stepdaughter came home and told him that she had "been raped and beaten by five Negroes." He also confirmed that Pettis' billfold and the wine bottle were found at the scene the next morning, and that he had seen the Nova vehicle driving nearby.
A female friend of appellants testified and was able to place the four appellants and a fifth black male in the Eldorado Cadillac shortly before midnight riding in the area just as testified to by the victim. This witness identified the vehicle and appellant Cook as its owner.
Deputy Lang, an experienced officer of the Polk County Sheriff's Department, testified that he found a wine bottle at the scene of the incident similar to the one the victim claimed Brown had threatened her with. Even more incriminating was his testimony as to discovery of Pettis' wallet just where the victim had told him beforehand it would be. This officer also confirmed that he had seen the Nova and pursued it. Further, he verified that Cook and his father were owners of the Eldorado and that a consensual search of it had produced the victim's underpants, belt, blouse buttons, and hairs, as well as a bottle cap matching the wine bottle found at the scene.
Deputy Markham testified that he had seen the blue Nova shortly after it had eluded Deputy Lang. Markham followed it to a house. The two occupants got out of the car and entered the house. As he and another officer approached the house, the two men fled out the back door. The officers captured one of the men, appellant Cook.
An F.B.I. fingerprint expert identified both Cook and Brown's fingerprints on the Eldorado vehicle. A firearms and tool marks identification expert identified the bottle cap found in the car as having been originally joined to a wine bottle of the same type as that found at the scene. A crime laboratory chemist testified that the buttons remaining on the victim's jacket appeared to be the same as the buttons found in the Eldorado. The chemist also opined that the hairs found in the car were similar in all respects to the victim's hair.
The owner of the truck used to tow the Eldorado also testified. He said that late one night in December appellant Brown came and asked him to tow a car. The man agreed to help because Brown had done him *917 a favor in the past. He followed a blue Nova in which Brown and his companion were riding to where the Eldorado was located. He then towed the Eldorado away as he was directed, and did not remember seeing the victim.
Despite rigorous cross-examination the victim's highly detailed testimony remained consistent about the events on the night of the incident. Her descriptions, identifications, and testimony about the events were corroborated by other witness' testimony and by tangible evidence. There was overwhelming evidence of each appellant's guilt.
Brown was positively identified by the victim, and his fingerprints were found in the Eldorado. The man who towed the Eldorado testified that Brown had come to his house and asked him to tow a car. Brown admitted in his own statement that he was with the other appellants on the night of the incident, though he claimed that he parted company with them before they picked up the victim.
Cook was also positively identified by the victim. He was the owner of the Eldorado, and his fingerprints were found in it. He was seen in the blue Nova and was apprehended when he attempted to flee.
Black admitted in his statement that he had sexual intercourse with the victim, though he claimed it was consensual. He was apprehended along with appellant Brown in Ft. Pierce, Florida approximately a week after the incident.
As mentioned previously Pettis has no standing to contest his own statement, and he was not prejudiced by the two other statements.
From our careful review of the record we conclude that the introduction of the challenged statements of Brown, Black, and Pettis was harmless beyond a reasonable doubt. True, there was an intimation to the jury that appellants as a group acted together. Yet, the victim's detailed and unimpeached testimony was corroborated by testimonial and tangible evidence so as to provide overwhelming evidence of guilt of each appellant. If, therefore, the court committed error in failing to grant the severance as requested or in admitting statements of the appellants at their joint trial, it was harmless.
We find no merit in appellants' argument that the trial judge erred in failing to direct a verdict of not guilty on the conspiracy and sexual battery charges. Likewise, we find no error in any of the other points raised by appellants. Accordingly, the judgment and sentence of each appellant is hereby affirmed.
BOARDMAN, C.J., and GRIMES, J., concur.
NOTES
[1] Defense counsel also moved for a change of venue from Polk County which was granted.
[2] See also Serio v. United States, 131 U.S.App. D.C. 38, 401 F.2d 989 (1968), in which a codefendant's statement contained incriminating references to "another man." As it was obvious from the circumstances that this "other man" was the defendant, his conviction for altering postal money orders was reversed.
[3] We can readily conceive of some nonidentifying references being made in a codefendant's statement that would not be a Bruton violation. For example, where the court admits a statement of a codefendant which merely makes casual or isolated references to others being involved without detailing their actions, it would be improbable that such innocuous references would be "highly likely" to incriminate another codefendant.
[4] It appears that the fifth man involved did not have intercourse with the victim. In any event, he was not tried with the four appellants.