Darryl D. RAWLS

v.

Ernest S. PATTON, Superintendent, State Correctional Institution At Camp Hill and The Attorney General of the State of Pennsylvania.

Civ. A. No. 83–3464.

United States District Court, E.D. Pennsylvania.

March 30, 1984.

Karl Baker, Asst. Defender, John W. Packel, Asst. Defender, Chief, Appeals Div., Benjamin Lerner, Defender, Defender Ass'n of Philadelphia, Philadelphia, Pa., for plaintiff.

Gaele M. Barthold, Steven J. Cooperstein, Asst. Dist. Attys., Philadelphia, Pa., for defendant.

MEMORANDUM AND ORDER

KATZ, District Judge.

Following his state court conviction on charges of rape, conspiracy, possession of instruments of crime, and unlawful re-

straint, and following exhaustion of his state court remedies, petitioner filed this habeas corpus action, alleging that his Sixth Amendment rights were violated at his trial. The writ will be denied on the ground that any error complained of was harmless beyond a reasonable doubt.

## I. FACTS

Petitioner was one of three defendants tried jointly for an incident that occurred on October 18, 1976. The evidence of the complainant Joanne Ingram was as follows:

Ms. Ingram was standing on Germantown Avenue sometime in the afternoon on that day, waiting for a trolley. While waiting she went into the Castle Bar, at the corner of Germantown and Somerset, and put some money in the jukebox. Then she stood on the corner listening to the music and waiting for the trolley. A strange man (not a defendant) approached her and forced her to accompany him to a nearby house by holding an ice pick to her side. In the house there were several people including the three defendants: Eddie Rhodes, Daniel Griffin, and petitioner Darryl Rawls. Someone took her upstairs and forced her to snort a white powder. Eddie Rhodes then told her the powder was his and took the few dollars Ms. Ingram had with her as "payment." She was taken back downstairs. Petitioner Rawls then took her back upstairs, at point of ice pick. Rawls took her to the upstairs middle bedroom and forced her to have intercourse with him. Rawls told Rhodes and the others to leave because he didn't want them to watch. Later defendant Griffin also had sex with her, while Rawls held her down with the ice pick. Defendant Rhodes took Ms. Ingram's coat and then she was allowed to leave.

Ms. Ingram left the house and called the police. She explained what had happened and took the police to the house where the rapes occurred. The police recovered an ice pick and a piece of tin foil containing white powder from the upstairs middle bedroom, and arrested defendant Daniel Griffin. Petitioner Rawls was found nearby and was apprehended after a short chase. Defendant Rhodes was arrested subsequently.

The defendants' version of events was that Ms. Ingram voluntarily had intercourse with Rawls and Griffin and that she invented the rape story because she was angry that her money and coat were taken.

## II. ALLEGED BRUTON VIOLATION

At trial, the Commonwealth offered testimony from a detective regarding a statement that he took from defendant Griffin. It is this statement that gave rise to Rawls's petition for habeas corpus.

■ Under *Bruton v. U.S.*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), a statement of a nontestifying codefendant cannot be admitted if it powerfully incriminates the complaining defendant, since this violates his right of cross-examination secured by the confrontation clause of the Sixth Amendment. Griffin did not testify at trial and thus was not subject to cross-examination regarding his statement. The statement was redacted before trial to remove the names of the other defendants. Before the redaction the statement read, in relevant part:

I [Griffin] was in the kitchen ... with two of my friends ... fixing motorbikes. Darryl Rawls my cousin, Eddie, and some tall dude came into the house and they had a girl with them.... Eddie ... put ... powder in a piece of tin foil.... [T]hen all four went upstairs. Then me and my friends also went upstairs.

Darryl [Rawls], Eddie [Rhodes], the tall dude and the girl went in the middle room and closed the door. Me and my friends went into my mother's room. There's a door between my mother's room and the second floor middle bedroom and the door has a lot of holes in it. We took turns peeking through the holes at what was going on.

I saw Darryl on the girl, they were on the bed and the girl was crying. Darryl got off of her and took her money. Then the tall dude came out of the middle

room and asked me if I wanted some. I said that I would think about it. A couple of minutes later I went in the middle room. The girl was lying on the bed and her pants were back up. Darryl pulled her pants back down. She was on the bed on her back and I got on her. I got inside her for a couple of seconds and got right out because she started crying. I got off of her and she pulled her panties back up. I got out of the room and left the house. Eddie took the girl's coat and Darryl took her wallet and the girl started crying hard. Later in the day I heard about Darryl getting locked up.

The redacted statement used at trial was:

I was in the kitchen of my mother's house at 2828 North Eighth Street, with two of my friends. We were fixing motor bikes. Some other fellows came into the house and they had a girl with them. They sat in a little room for a while; they were talking about some drugs. Then they went upstairs. Then me and my friends also went upstairs.

Some of the fellows and the girl went into the middle room and closed the door. Me and my friends went into my mother's room; there is a door between my mother's room and the second floor middle bedroom and the door has a lot of holes in it. We took turns peeking through the holes, at what was going on. I saw they were on the bed and the girl was crying. Then one of the guys came out of the middle room and asked me if I wanted some. I said that I would think about it. A couple of minutes later I went into the middle room. The girl was lying on the bed and her pants were back up. Someone pulled her pants back down. She was on the bed, on her back, and I got on her. I got inside her for a couple of seconds and got right out, because she started crying. I got off of her and she pulled her pants back up. I got out of the room and left the house. Someone took the girl's coat and someone took her wallet, and the girl started crying hard.

Tr. 516–518.

Petitioner argues that "(t)he codefendant's statement might have been rendered unobjectionable by additionally deleting those sections which implied force or lack of consent," Petitioner's Memorandum, p. 25. This further redaction proposed by petitioner would delete "and the girl was crying"; "someone pulled her pants back down"; and "because she started crying," because these are inconsistent with voluntary intercourse. According to petitioner, the further redaction with the additional deletion of the underlined and bracketed portions would have looked as follows:

I was in the kitchen of my mother's house at 2828 North Eighth Street, with two of my friends. We were fixing motor bikes. Some other fellows came into the house and they had a girl with them. They sat in a little room for a while; they were talking about some drugs. Then they went upstairs. Then me and my friends also went upstairs.

Some of the fellows and the girl went into the middle room and closed the door. Me and my friends went into my mother's room; there is a door between my mother's room and the second floor middle bedroom and the door had a lot of holes in it. We took turns peeking through the holes, at what was going on. I saw they were on the bed [*and the girl was crying*]. Then one of the guys came out of the middle room and asked me if I wanted some. I said that I would think about it. A couple of minutes later I went into the middle room. The girl was lying on the bed and her pants were back up. [*Someone pulled her pants back down*]. She was on the bed, on her back, and I got on her. I got inside her for a couple of seconds and got right out [*because she started crying*]. I got off her and she pulled her pants back up. I got out of the room and left the house. Someone took the girl's coat and someone took her wallet, and the girl started crying hard.

Petitioner's Memorandum of Law, p. 25, footnote.

Petitioner also objects to the Assistant District Attorney's closing argument. At one point, the jury heard the following:

RENFROE: ... Rawls was on top of her, they were having fun and laughing, and Rawls said get out of the room and they went but they went through the middle room. This is—This is Daniel Griffin's—

PALLASTRONE: Objection. That's not what that statement said. Mr. Renfroe knows that.

THE COURT: The jury will recall the evidence, not by what counsel says but by their own recollection.

RENFROE: This is Daniel Griffin's statement, he's the one who said this....

N.T. 7/6/77, 51. Mr. Renfroe went on to say:

"Then one of the guys came out of the middle room and asked me if I wanted some." Rawls pushed her on the bed and said he wanted some. Does that coincide with the statement?

N.T. 7/6/77, 52.[1] Petitioner claims that these remarks nullified the editing that had been done on the Griffin statement and constituted a *Bruton* violation.

Both of petitioner's objections will be discussed below.

### III. THEORY OF BRUTON

The Supreme Court in *Bruton* recognized that where codefendants are tried jointly, the court cannot always rely on the efficacy of instructions to the jury cautioning them to consider a piece of evidence against one defendant only. In *Bruton*, two defendants were charged with armed postal robbery, and after a joint trial, both were convicted. Both appealed. The conviction of one defendant, Evans, was set aside because his confession was improperly used against him at trial. At his retrial, with the confession excluded, Evans was acquitted. Bruton's conviction was not set aside even though Evans's tainted confession was used at their joint trial, because it

was not admitted against *him*. The trial judge had instructed the jury that the confession was to be used against Evans only.

The Supreme Court found that Bruton had been prejudiced by the introduction of Evans's confession and that the trial judge's limiting instructions were not enough to cure the prejudice. Although the Court recognized the value of joint trials (which "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial", 391 U.S. at 134, 88 S.Ct. at 1627), the Court decided that introduction at a joint trial of a nontestifying codefendant's confession was a serious encroachment on the complaining defendant's right to confrontation. The Court noted that confessions are powerful pieces of evidence while at the same time "their credibility is inevitably suspect," given "the recognized motivation to shift blame onto others." 391 U.S. at 136, 88 S.Ct. at 1628. Thus, a codefendant's confession that is "powerfully incriminating" should not be introduced at a joint trial if the complaining defendant does not have an opportunity to cross-examine the codefendant. The Court suggested that editing the confession to delete references to other persons could be a solution to the problem. 391 U.S. at 134 n. 10, 88 S.Ct. at 1627.

### IV. WHEN IS A STATEMENT "INCRIMINATING" UNDER BRUTON?

Since *Bruton*, the practice of redacting confessions has become common. For example, in *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), the confession of the nontestifying codefendant did not refer to Harrington by name but as "the white guy," where Harrington was the only white defendant. The Court found that "reference to 'the white guy' made it as clear as pointing and shouting that the person referred to was the

---

1. The prosecution misstated what Griffin said. Griffin did *not* say that Rawls and Ingram were "having fun and laughing"; rather, Griffin said "the girl was crying." The district attorney misquoted the statement, making it more favorable to the defense.

Also, nowhere in the redacted or unredacted statement does Griffin say that Rawls pushed Ingram on the bed and said he wanted some. Griffin said "the tall dude [not Rawls] came out of the middle room and asked me if I wanted some."

white man in the dock with the three Negroes." 395 U.S. at 253, 89 S.Ct. at 1728. However, this *Bruton* violation was found to be harmless error.

■ This Circuit has held redacted confessions admissible as long as they do not "explicitly suggest the participation of the complaining defendant," *U.S. v. Belle*, 593 F.2d 487, 493 (3d Cir.1979), even if "evidentiary linkage" or "contextual implication," when added to the statement, make it inculpatory. The statement is to be judged on its face.

In *Belle*, the codefendant's statement was that on a certain day he was going to deposit heroin in a trash can near a certain Krispy Kreme Donut Shop, and that he had transported heroin into the same area 2 or 3 times before and had twice met with a Mr. Roberts. Belle claimed that the statement was incriminating as to him because he was arrested in the company of Roberts and had been at the doughnut shop one hour before the scheduled time for delivery of the heroin. The court decided that the statement itself was not powerfully incriminating as to Belle and was thus admissible under *Bruton*. *See also U.S. v. Lipowitz*, 407 F.2d 597 (3d Cir.), *cert. denied*, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969) (statement that "the other fellows" talked Lipowitz out of destroying the stolen money did not inculpate Smith); *U.S. v. Panepinto*, 430 F.2d 613 (3d Cir.), *cert. denied*, 400 U.S. 949, 91 S.Ct. 258, 27 L.Ed.2d 256 (1970) (statement that some of the participants in the crime were at a house in Jersey City didn't incriminate Baglino, who testified, in response to a question from his own lawyer, that he lived in Jersey City).

## V. WAS GRIFFIN'S REDACTED STATEMENT POWERFULLY INCRIMINATING AS TO RAWLS?

As a preliminary matter, the court rejects the Commonwealth's argument that

the edited statement was not harmful to Rawls's defense. The Commonwealth argues that the references to Ms. Ingram's crying do not necessarily indicate lack of consent to the sexual intercourse, since she could have been crying about the loss of her money or coat, or out of concern about how she would explain her long absence from home. However, statements such as "I saw they were on the bed and the girl was crying," "Someone pulled her pants back down," and "[O]ne of the guys ... asked me if I wanted some," point strongly toward nonconsensual intercourse.

The question is how one determines whether this statement is powerfully incriminating as to Rawls. Under the Third Circuit's test, the redacted Griffin statement on its face arguably does not incriminate Rawls. Although the statement does indicate that *someone* raped Ingram it is not evident from the statement alone *who* that someone is. Only when it is combined with other evidence does the statement indicate that Rawls raped Ingram. This is how the Pennsylvania Superior Court viewed the case:

> The challenged statement may implicate appellant only insofar as other "connecting evidence" may tie appellant to the rape and to Griffin but we do not believe that the *statement qua statement* can be said to be "powerfully incriminating" to appellant since it alone does not serve to connect him with the crime.

*Commonwealth of Pennsylvania v. Rawls*, No. 689, slip. op. at 8 (Pa.Super.Ct. October Term, 1978).

Petitioner argues that deleting the statement's identification of Rawls as the other person who had intercourse with Ingram did not help since there was no real issue at trial as to whether Rawls had intercourse with Ingram.[2] The issue at trial was not who raped Ingram, but whether the intercourse between Rawls and Ingram had been consensual.

---

**2.** At trial, a criminalistics technician with the police department testified that tests done on Ingram's panties and slacks and Rawls's boxer shorts indicated the presence of seminal fluid.

The technician did not test whether the seminal fluid on the boxer shorts was the same type as the seminal fluid on Ingram's clothing. Tr. 652.

Petitioner's argument is that the "incriminating on its face" test is to be applied with reference to the relevant issue in the case, based on the aspect of the prosecution's case contested by the defense. If the defendant argues mistaken identity, then identification is the relevant issue, and deletion of the defendant's name or other identifying references is a proper redaction, even if there is other evidence in the case that tends to identify the defendant as a participant in the crime. On the other hand, if, as here, the defense is consent, then that is the relevant issue, and a statement will be incriminating to the defendant if it contradicts this defense.

In his Memorandum of Law, petitioner cites five state court cases that involve a *Bruton* issue in the context of a defendant's consent defense to a rape charge. Pp. 26 et seq. None of these cases squarely addresses the issue in this case, namely: Is a codefendant's statement powerfully incriminating, using an "on its face" test, if it doesn't name or directly identify the complaining defendant, but negates his consent defense on a rape charge?

In three of the cited state court cases, the codefendant's statement not only indicated that the victim had been raped but also named the defendant as the rapist. Thus these cases are distinguishable from the instant case, where Rawls's name was removed from the statement. *See In re Whitehorn*, 1 Cal.3d 504, 462 P.2d 361, 82 Cal.Rptr. 609 (1969); *People v. Walker*, 36 A.D.2d 959, 321 N.Y.S.2d 646 (1971); *Sewell v. State*, 153 Ga.App. 177, 264 S.E.2d 708 (1980). In the other two cases, the codefendant's statement was redacted to remove direct references to the complaining defendant, but the court did not apply the "on its face" test to decide whether the redacted statement was powerfully incriminating.

In one of the two cases, *State v. Williams*, 27 Ariz.App. 279, 554 P.2d 646 (1976), a woman was raped by several men. One defendant, Smiley, made a statement to the effect that the woman consented to intercourse with him but resisted intercourse with the others. The complaining defendant, Williams, claimed that the woman willingly engaged in sexual intercourse with all the men, including himself. Smiley's statement was admitted at trial, with the names of the men removed. The court, in reversing Williams's conviction, decided that "in the context of Williams' own statements and other evidence at trial, the inevitable effect of the Smiley statements ... was to inculpate Williams." 554 P.2d at 654. The Williams court, by viewing the statement in light of the other evidence at trial, did not use the "on its face" standard adopted by the Third Circuit. The court decided that the statement was incriminating because it *identified* Williams when combined with the other evidence in the case. Thus the issue of whether the statement alone incriminated Williams, because it contradicted his defense of consent, was not squarely addressed.

In the other case *Cook v. State*, 353 So.2d 911 (Fla.App.1977), which had similar facts, the court also failed to decide the issue raised by petitioner in this case. The Florida Court stated:

We see some inconsistency in the reasoning used by the various courts in analyzing *Bruton* problems. The Supreme Court of Arizona [in *Williams, supra*] found a *Bruton* violation even though the defendant was incriminated only by his codefendant's statement when viewed in *conjunction* with the other testimony at their trial. On the other hand, the Second Circuit [in *U.S. v. Wingate*, 520 F.2d 309 (2d Cir.1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976)] opined that the codefendant's statement must incriminate the defendant directly, and that it is not a *Bruton* violation where the codefendant's statement incriminates the defendant only when considered in light of the testimony of other witnesses.

353 So.2d at 914. The Florida court decided to follow *Williams*, and thus found that the codefendant's redacted statement, when viewed in conjunction with other evidence, could be incriminating to the other

defendants. The court found that any error was harmless, however.

Although petitioner has not cited any cases that adopt his theory—i.e., that the incriminating nature of a statement must be assessed with regard to the relevant issue in the case—the contention is not free from doubt.[3] Where identity is not at issue, it is unclear that removing the defendant's name from the statement solves the *Bruton* problem.

I do not find it necessary to decide whether Griffin's statement was properly redacted to comply with *Bruton*. Given the powerful evidence against Rawls, apart from Griffin's statement, I am convinced that any error was harmless beyond a reasonable doubt.[4]

## VI. HARMLESS ERROR

In deciding whether the use of Griffin's statement was harmless beyond a reasonable doubt, the court must base its judgment on the evidence in the record and "on what seems ... to have been the probable impact [of the statement] on the minds of an average jury." *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969).

Error is harmless "where the independent, properly admitted evidence of the defendant's guilt is so overwhelming that a court can be certain, beyond a reasonable doubt, that the defendant would have been convicted even absent the *Bruton* violation." *U.S. v. Ruff*, 717 F.2d 855 at 858 (3d Cir.1983).

Here, the prosecution produced strong evidence, other than Griffin's statement, indicating that the intercourse between Rawls and Ingram was not consensual. Direct evidence came from Ms. Ingram herself, who testified: "Rawls pulled the [ice] pick out of his back pocket and he took me back upstairs, and we got in the room, he pushed me down on the bed." Tr. 717. "... Rawls had the pick up by my neck, and he pulled my pants, busted my zipper and pulled my pants down." Tr. 719. "He had pulled my pants down and my panties to my knees. Holding the pick up to my neck, and he was pulling his pants down and his underwear." Tr. 720. "I was crying.... I had pushed him and he told me, 'Just be quiet. I don't want to hurt you.'" Tr. 721. Ms. Ingram was cross-examined for more than one full day but she consistently stuck to her story. Defense counsel seized upon minor discrepancies in her testimony, such as her conflicting testimony as to exactly how much money she was holding in her hand while waiting for the trolley on Germantown Avenue just before she was abducted, in an effort to attack her credibility. *See* Petitioner's Memorandum of Law, p. 11, second footnote. Despite some minor inconsistencies in her testimony, a fair reading of the record is that her testimony held up under strong cross-examination.

Ms. Ingram's testimony was corroborated by physical evidence. The most damaging piece of evidence in the prosecution's case was the ice pick recovered by police from the bedroom where Ms. Ingram said the rape occurred. The defense did not have any explanation for the ice pick being found in the bedroom. Tr. 7/1/77, 105. At oral argument, counsel for the petitioner suggested that it could have been used as a tool by the boys working on a mini-bike in the adjacent bedroom, and that one of the boys might somehow have left it in the middle bedroom, but no evidence to this effect was produced at trial. Ms. Ingram's

---

**3.** For an argument that statements that do not directly implicate the codefendant should nonetheless be inadmissible where the issue is whether a crime occurred, not whether the codefendant participated in the offense, see Haddad, "Post-*Bruton* Developments," 18 American Criminal Law Review 1, 22 (1980).

**4.** Magistrate Scuderi reaches the same result by an approach that combines consideration of how incriminating the statement itself was and how much other evidence the government had, with consideration of the factors providing the rationale for the *Bruton* rule, i.e., whether the statement was ever subject to any cross-examination, whether cross-examination could have made any difference, and whether there is a risk that the jury will improperly use the statement against the defendant.

pants with the broken zipper were also admitted into evidence. Tr. 335.

The prosecution also presented the testimony of Officer Rush and Detective Carlin who said that Ingram was crying and upset, and her clothes were disheveled, on the evening of October 18, 1976, after the events in question took place. Tr. 319; Tr. 627. Ms. Ingram's mother also testified that when her daughter came home her pants were "busted" and her coat was gone, and she was crying and upset. Tr. 7/5/77, 26. In all, the prosecution's case offered clear evidence that Ingram had been raped by Rawls.

The defense attempted to show that Ingram was friendly with "Big Eddie" and had come to the house voluntarily. Tr. 7/1/77, pp. 72 et seq.; 149 et seq. The evidence presented on this issue was not particularly strong, and in any event this line of defense does not address the relevant issue in the case, i.e., what happened later between Ingram and the defendants, and whether Ingram consented to have intercourse with Rawls and Griffin.

On the evidence in the record, without relying on Griffin's statement, the jury would have accepted Ms. Ingram's version of events and found Rawls guilty of rape. Any error in admitting the redacted statement was harmless beyond a reasonable doubt.

## VII. ALLEGED BRUTON VIOLATION DURING CLOSING ARGUMENT

■ Petitioner also argues that the prosecutor made improper reference to Griffin's statement in his closing argument. In his closing, the prosecutor said: 1) that Griffin's statement was that "*Rawls* was on top of her", and 2) that the sentence "one of the guys came out of the middle room and asked me if I wanted some" from Griffin's statement coincided with Ingram's testimony that Rawls pushed her on the bed. *See* closing argument excerpts, *supra*, p. 6. Petitioner argues that by re-in-

serting Rawls's name, the prosecutor nullified the already inadequate redaction.

Petitioner cites *U.S. v. Alvarez,* 519 F.2d 1052 (3d Cir.1975) for the proposition that it is error to allow the prosecutor in closing argument to refer to a redacted statement to corroborate evidence being used against the confessor's codefendants. 519 F.2d at 1054. This rule was adopted by the Third Circuit in *Alvarez* pursuant to its supervisory authority over the administration of criminal justice in the district courts. *Id.* The Third Circuit made it clear that such a rule is not a *constitutional* requirement. ("Under *Bruton* and *Lipowitz,* the Constitution requires only that the redacted confession not in itself 'inculpate' the other defendants," 519 F.2d at 1055.) When a writ of habeas corpus is sought, the petitioner must demonstrate a violation of his constitutional rights. 28 U.S.C. § 2254(a). For this reason, the Magistrate correctly concluded in his Report and Recommendation that the prosecutor's remarks "do not constitute grounds for grant of a writ of habeas corpus from a state conviction." Report and Recommendation, p. 19.

Even if *Alvarez* were applicable to the case before me, I would find the prosecutor's remarks harmless beyond a reasonable doubt. His use of Rawls's name was not prejudicial error, given that Rawls's presence in the house and his intercourse with Ingram were not seriously contested. Further, the prosecutor's offending remarks were a relatively minuscule part of a trial that lasted seven days (from the prosecutor's opening statement on June 27, 1977 to the jury charge on July 6, 1977) and were not likely to have made a deep impression on the jury, given the amount of evidence they had already heard.[5] In this particular case it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty, based on the evidence, absent the prosecutor's remarks. *See U.S. v. Hastings,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96, 1981 (1983).

---

**5.** As the Supreme Court stated recently, "A reviewing court must begin with the reality that the jurors sat in the same room day after day

with the defendants and their lawyers ...." *U.S. v. Hastings,* 461 U.S. 499, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983).

## VIII. CONCLUSION

For the reasons stated in this Memorandum, the petition for a writ of habeas corpus will be denied. There is probable cause for appeal.